In the Matter of the Welfare of Shannon Noel SOLOMON, Child.

Nos. 49560, 49573, and 49586.

Supreme Court of Minnesota.

Jan. 25, 1980.

W. B. Haas, Hutchinson, for Hayes, et al.

Gavin, Gavin & Olson and Kerry B. Olson, Guardian Ad Litem, Jeanne M. V. Conkel, Asst. Guardian Ad Litem, Glencoe, for Solomon.

Stephen K. Erickson, Minneapolis, for Callier.

Peter Kasal, County Atty., Glencoe, for County of McLeod.

Heard before PETERSON, KELLY and SCOTT, JJ., and considered and decided by the court en banc.

KELLY, Justice.

Katherine Callier, the natural mother of Shannon Solomon, brought a motion in McLeod County Court, Family Court Division, to quash an earlier finding that Shannon was a dependent child. Shannon's foster parents, Richard and Mary Hayes, subsequently brought a petition to terminate Callier's parental rights as to Shannon. These two proceedings were consolidated and a hearing was held in which Shannon's guardian ad litem, the Assistant McLeod County Attorney, and attorneys for the Hayes and Callier, participated. After the

hearing, the Family Court ordered that Callier's parental rights be terminated based on Shannon's best interests and Callier's lack of rehabilitation. In the alternative, the Family Court ordered a continuation of dependency. Callier appealed these rulings to a three-judge panel of the First Judicial District, which reversed the termination on the ground that the evidence was insufficient to support it. The district court panel also remanded for a further hearing on the dependency issue, in which only circumstances occurring subsequent to the original hearing should be considered. The Hayes and the guardian ad litem for the child then brought this appeal from the decision of the district court panel. We granted discretionary review and now affirm.

Katherine Callier gave birth to Shannon Solomon on December 4, 1970. Shannon's father was one Harold Solomon, who lived with Callier for a total of 4 years. In June of 1972, because Callier apparently left Shannon with a babysitter for extended periods of time, Callier's mother filed a petition to have Shannon adjudicated a dependent child under Minn.Stat. § 260.015 subd. 6(d) (1978). This petition was granted on July 11, 1972, and Shannon was placed in foster care on July 25, with appellants Richard and Mary Hayes of Glencoe, Minnesota. At that time Shannon was approximately 19 months old. Callier apparently did not live in McLeod County during this period.

In Minneapolis, Callier gave birth to another child, Kirk, on January 11, 1973, whose father was allegedly one Robert Walter.[1] Walter and Callier lived together for approximately 6 or 7 months. Although Callier's visitation of Shannon was sporadic because of the expense of the trip between Minneapolis and Glencoe, it was thought that she had made enough progress to petition the court to vacate the order of dependency on October 4, 1974. This petition was denied, but Callier's visitation was expanded. Callier was in an automobile accident on November 21, 1974. This interfered substantially with her subsequent visitation for a time. At the Family Court hearing, the Hayes testified that when Shannon was scheduled to visit Callier, Shannon sometimes did not want to leave. Shannon herself did not testify at the hearing.

From approximately mid-1974 to the date of the hearing, Callier had had a "close relationship" with one Jerry Nystrom, leading to an engagement at Christmas, 1975. He apparently stayed overnight at her residence occasionally, sometimes when Shannon was visiting, although he did not live there.

Between the time of the Family Court hearing which was held on December 29–30, 1975 and February 10–12, 1976, and the time that Shannon had been adjudicated a dependent child in 1972, Katherine Callier had gone through group therapy and counseling, and according to one witness had become a "trusting, open, truthful person." At the time of the hearing, Katherine lived with her son in a 2-bedroom house in South Minneapolis. She remained, however, unemployed and on A.F.D.C.

At the December/February hearing, the Family Court judge allowed the Hayes to participate over Callier's objection. After the hearing, the court ordered Callier's rights terminated, or, in the alternative, a continuation of dependency. In the memorandum accompanying his order, the Family Court judge relied heavily on Minn.Stat. § 257.025 (1978), which provides a list of factors for a court to consider in evaluating the best interests of a child in a proceeding where two or more parties seek custody of that child. Thus, he based the termination in part on the ground that it would be in Shannon's best interests. The Family Court judge also ruled that Callier had not been adequately rehabilitated.

The issues presented to us on appeal are:

1. Does Minn.Stat. § 257.025 (1978) or the "best interests of the child" test apply to a proceeding to terminate parental rights?

2. Was the evidence sufficient in this case to support a finding that specific

---

1. The complaint for a determination of paternity against Walter, however, was dismissed.

grounds for termination exist under Minn. Stat. § 260.221(b)(4) & (5) (1978)?

3. Does Minn.Stat. § 257.025 (1978) apply to this dependency proceeding, and does the evidence support a continuation of dependency? [2]

■ 1. In his ruling to terminate Callier's parental rights, the trial judge relied extensively on Minn.Stat. § 257.025 (1978), which provides a list of factors for determining the best interests of the child "[i]n any proceeding where two or more parties seek custody of a child * * *." The Hayes and the guardian ad litem argue that he was correct in this determination. By its terms, however, section 257.025 relates only to *custody*. Terminating or refusing to terminate parental rights does not necessarily lead to a change in custody, and therefore the statute must be viewed as irrelevant in a termination proceeding. *See In re Linehan*, 280 N.W.2d 29 (Minn.1979) (parental rights of natural father not terminated, and custody remained unchanged with natural mother and stepfather). In short, termination has no necessary relationship to questions concerning custody. There is no evidence of legislative intent that the statute should apply.

The Hayes and the guardian ad litem further assert that "the best interests of the child" should be the major factor in a decision whether or not to terminate paren-tal rights; in other words, that the focus should primarily be on the child's welfare, rather than the parent's unfitness.[3] This court has recently addressed this question in *In re Linehan*, 280 N.W.2d 29 (Minn. 1979), in which the court refused to "fashion a new rule which permits parental rights to be terminated whenever it is in the best interests of the child to do so." *Id.* at 30. Thus a noncustodial father's parental rights with regard to his child were not terminated because no specific grounds for termination under Minn.Stat. § 260.221 (1978) existed.

■ We continue to adhere to the principle put forth in *Linehan* that parental rights may not be terminated unless the petitioner can show sufficient evidence that a specific statutory ground for termination exists.[4]

■ 2. Although findings of fact by the trial judge will not be overturned in a termination case unless "clearly erroneous," *see In re J. M. S.*, 268 N.W.2d 424, 428 (Minn.1978), this court has also stated that it "will continue to exercise great caution in termination proceedings, finding such action proper only when the evidence clearly mandates such a result in accordance with the statutory grounds." *In re Kidd*, 261 N.W.2d 833, 835 (Minn.1978). The petitioner has the burden to show such grounds for termination in the trial court by clear and

2. Respondent Callier also argues that the trial court abused its discretion in allowing the foster parents, the Hayes, to participate in the consolidated termination and dependency proceedings. We need not address this question since we find in favor of the respondent on the other issues.

3. Cases from certain other jurisdictions lend some support to the guardian ad litem's argument. For instance, in *In re William L.*, 477 Pa. 322, 383 A. 2d 1228, *cert. denied, Lehman v. Lycoming Co. Children's Services*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978), the court partially accepted a best interests standard for termination of a natural mother's rights because long-term foster care had prevented a return to the mother. *See also In re Kegel*, 85 Wis.2d 574, 271 N.W.2d 114 (1978). The leading authority for the proposition that the qualifications and feelings of adults should be *totally disregarded* in proceedings affecting the welfare of children is J. Goldstein, A. Freud, & A. Solnit, *Beyond the Best Interests of the Child* (1973). The authors contend that the psychological welfare of children requires a heavy presumption that they be allowed to stay with their "psychological parents," or adults with whom the children have formed a close bond, regardless of the justice of any contrary claim by an adult. *Id.* at 17–28.

4. In 1978, the Minnesota Legislature made extensive changes regarding the subject of children in foster care. *See* Act of Mar. 28, 1978, ch. 602, § 13, 1978 Minn. Laws 365 (repealing Minn.Stat. § 257.07·(1976)); *id.*, §§ 1, 6, 10 (codified at Minn.Stat. §§ 257.071, 260.155 (subd. 7), 260.221(b)(7) (1978)). These changes went into effect July 1, 1978, *id.* § 14, and thus are irrelevant to this case. We express no opinion as to how these changes have affected existing law.

convincing evidence. *See In re Rosenbloom*, 266 N.W.2d 888, 889–90 (Minn.1978).

Besides deciding that termination was in the best interests of the child, the trial court terminated Callier's parental rights for the following reasons:

That following a determination of dependency by the McLeod County Court reasonable efforts under the direction of the Court, failed to correct the conditions that lead to the dependency determination, and that the mother is still in such an emotional state and a state of immaturity that she is not a fit and proper mother for the child and that in the first instance she abandoned the child and subsequent to the placement in the foster home her actions constituted a defacto abandonment of the child in her refusal to regularly visit the child and/or to correct the conditions.

Assuming arguendo that these findings are specific enough to conform to the statutory language of both Minn.Stat. § 260.221(b)(4) and (5) (1978),[5] *see Zerby v. Brown*, 280 Minn. 514, 160 N.W.2d 255 (1968), we will proceed to the questions of whether the evidence was sufficient to support one or both grounds. The Hayes and the guardian ad litem cite the various close relationships that Callier had with male companions, including the admittedly current relationship outside marriage with Jerry Nystrom at the time of the hearing, and her relatively infrequent visitation as circumstances that would justify a finding of unfitness under subsection (b)(4).

■ Sporadic or infrequent visitation by itself is insufficient to support a termination finding. *See McDonald v. Copperud*, 295 Minn. 440, 206 N.W.2d 551 (1973). This is because the court in a subsection (b)(4) termination case relies not primarily on past history, but "to a great extent upon the *projected* permanency of the parent's inability to care for his or her child." *In re Kidd*, 261 N.W.2d 833, 836 (Minn.1978) (emphasis added); cf. *In re Linehan*, 280 N.W.2d 29, 31 (Minn.1979) (interpreting Minn.Stat. § 260.221(b)(2) & (3) (1978) ("In any case, the test is whether the father is presently able and willing to assume his responsibilities and not whether he has from time to time in the past been derelict in his duties.") *In re Forrest*, 311 Minn. 11, 18, 246 N.W.2d 854, 857 (1976) (interpreting Minn.Stat. § 260.211(b)(5) (1978) (If circumstances show that natural father "is, or within a foreseeable time will be, able to provide the type of care" that his daughter requires, his parental rights should not be terminated).

■ In addition, sexual misconduct should not constitute a ground for termination if it is not likely to have an adverse effect on the welfare of the child. *Cf. Hansen v. Hansen*, 284 Minn. 1, 6, 169 N.W.2d 12, 15 (1969), where this court in a custody case stated:

Adultery is not itself enough to establish the unfitness of a mother. As indicated in *Reiland v. Reiland*, [280 Minn. 444, 160 N.W.2d 30 (1968)], one may be a bad wife but still be a good mother. Thus, the moral unfitness of the mother must be such as to have a direct bearing on the welfare of the child if she is to be deprived of custody.

There is insufficient evidence in the record that the sexual relationship Callier had with Jerry Nystrom at the time of the hearing had or was likely to have an adverse effect on Shannon. The testimony essentially was that the relationship was stable, and the couple's engagement to be married is strong

---

5. Section 260.221(b)(4), (5) provides: The juvenile court may, upon petition, terminate all rights of parents to a child in the following cases:

＊　＊　＊　＊　＊　＊

(b) If it finds that one or more of the following conditions exist:

＊　＊　＊　＊　＊　＊

(4) That the parents are unfit by reason of debauchery, intoxication or habitual use of narcotic drugs, or repeated lewd and lascivious behavior, or other conduct found by the court to be likely to be detrimental to the physical or mental health or morals of the child; or

(5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination;

evidence of that fact. It is noteworthy that no witness suggested that Callier's conduct required termination of parental rights in her son, Kirk, even though logically it would seem that this conduct would affect both Kirk and Shannon equally.

██ Likewise, there is insufficient evidence that Callier had failed to correct the conditions leading to the determination of dependency, the ground for termination under subsection (b)(5). The testimony was that she had acquired a house, had been a fit mother to her son, and had a stable relationship with a prospective spouse. None of the problems that caused her to leave Shannon alone with a babysitter for long periods of time was present at the time of the hearing. Thus the condition leading to that determination should be deemed to be corrected. We therefore hold that no specific statutory ground for termination of parental rights was proven at the hearing by clear and convincing evidence.

3. The guardian ad litem asserts that Minn.Stat. § 257.025 (1978) discussed *supra*, applies to this dependency proceeding.

As noted before, section 257.025 deals with custody matters; the statute provides that it should apply "[i]n any proceeding where *two or more parties* seek custody of a child * * *." (Emphasis added). The parties to the portion of the hearing that dealt with dependency were McLeod County, Katherine Callier, and Shannon, through her guardian ad litem.[6] Both the County and Callier took the position that the dependency proceedings should be quashed, and that custody of Shannon should be returned to her natural mother.

The guardian ad litem, although agreeing that this is "Not a true 'custody' dispute between the County, natural mother, and foster parents," argues that "[t]here are at least two parties seeking custody since the child herself is a party and she has raised the issue of custody." However, the guard-

ian ad litem's argument does not follow the wording of the statute, and to accept it, the court would have to subscribe to the anomalous proposition that Shannon is a party seeking "custody of a child," or that she seeks to have custody of herself.[7]

██ The guardian ad litem, nevertheless, did have standing as a party to protect the interests of the child, and therefore to promote the continuation of her dependency adjudication. *See* Minn.Stat. § 260.155(4), (6) (1978). The issue thus becomes whether the evidence supports such a continuation of dependency.

██ The primary purpose of the Juvenile Court Act is to ensure the welfare of minor children. *State v. Niemi*, 284 Minn. 225, 169 N.W.2d 758 (1969). A related purpose of the dependency and neglect statutes is to create a temporary remedy with the ultimate goal of returning the child to the natural parents. *Id.* at 229–30, 169 N.W.2d at 761. Therefore, there is a presumption that natural parents should be entrusted with the care of their children, and that they should not be deprived of custody except for "grave and weighty reasons." *In re Klugman*, 256 Minn. 113, 120, 97 N.W.2d 425, 430 (1959). This presumption is based "also on the public policy determination that the best interests of the child are normally served by parental custody." *In re A.R.W.*, 268 N.W.2d 414, 417 (Minn.), *cert. denied*, 439 U.S. 989, 99 S.Ct. 588, 58 L.Ed.2d 663 (1978). The test, therefore, for whether neglect or dependency status should be discontinued and the child returned to the natural parents is whether the evidence shows such a return "would not be seriously detrimental to [the child's] interests." *Id.* at 417.

██ In *State v. Niemi*, 284 Minn. at 230, 169 N.W.2d at 761, we held that, absent compelling circumstances to the contrary, a

---

6. The Hayes were not a party to this part of the hearing, but were participating solely on the issue of termination of parental rights. *See generally* note 2, *supra*.

7. We express no opinion whether section 257.-025 applies to the situation where the county joins the guardian ad litem in opposing a return to the natural mother. It may well be that the legislature intended the statute to apply to such a situation.

minor child should be returned to adequately rehabilitated natural parents. Here, there is no question that the district court was correct in determining that Katherine Callier was adequately rehabilitated at the time of the hearing. Even the evidence most favorable to a continuation of dependency indicates that Katherine Callier was a mother fit, willing, and able to take care of her children in the future. However, we find that there are compelling circumstances which mitigate against reversing the dependency status and returning Shannon to the custody of her natural mother at this time.

At the hearing, Dr. James Felling, a licensed consulting psychologist with a doctorate degree, recommended that Shannon remain in the custody of her foster parents. He made this recommendation "solely in view of the possible effects on Shannon." He found that a transference of custody from the Hayes back to Callier would cause feelings of grief, depression, anger, and rejection and permanent psychological damage to Shannon. He based this conclusion on three factors: (1) the young age at which Shannon was removed from Callier's home and length of time during which Shannon was in foster care; (2) the loving relationship which she had established with her foster family and Shannon's perception that the Hayes were her "family"; and (3) the lack of an establishment of a loving relationship with her natural mother. Dr. Felling's recommendation was made after seven 1-hour sessions were spent with Shannon. There was no substantial evidence which contradicted this testimony presented at the hearing. Leslie Faricy, a licensed psychologist with a master's degree, recommended that Shannon be returned to the custody of her natural mother. However, she made this recommendation after spending 1 hour with Shannon and Callier and based her recommendation on the fact that Callier was a capable parent. When questioned as to the effects on Shannon of a transference of custody, Faricy stated that

there was a likelihood that such action would have a permanent negative effect on Shannon but she could not predict the degree of damage.[8] On the basis of all this testimony, the trial court found that a transference of custody would cause psychological damage to the child.

While we do not express an opinion as to whether the trial court's finding was sufficient to justify continuing dependency, we find that, at the present time, a vacation of the dependency proceedings would be unwarranted. At the hearing, all of the testimony indicated that the longer the period of time during which a child is away from its natural home, the more psychological damage becomes a critical factor in determining whether the child can be transferred back to its natural home. This was found to be especially true if regular visitation by the natural mother is not maintained. In this case, Shannon has been in her foster home since she was 18 months old. She is presently 9 years old. During the last 4 years that this case has been on appeal, there has been no visitation between Callier and Shannon. Furthermore, during the preceding 3 years, there was only a 5-month period during which there was any significant contact between Shannon and her natural mother. Therefore, we take notice of the fact that an immediate transference of Shannon to the custody of her natural mother could be seriously detrimental to the psychological welfare of Shannon.

However, we are not unmindful that one of the purposes of our statute is to return a child to its natural parent when possible. Therefore, we remand this case to the trial court with instructions to commence a supervised program of increased parental control by Callier and counseling for Callier and Shannon with the ultimate goal of vacating the dependency order. Custody will then be returned to the natural mother if and when it may be done with minimal negative effects on the child.

8. Additionally, two social workers testified that, in their opinion, Shannon should be returned to her natural mother. However, these opinions were based solely on Callier's rehabilitation and there was no consideration of any possible effects on Shannon.

As modified, the decision of the 3-judge panel of the First Judicial District is affirmed and the dependency proceedings are remanded to the trial court.