**In the Matter of the WELFARE OF S.G. and K.G., Children.**

**Nos. C9–85–1909, C1–86–134.**

Court of Appeals of Minnesota.

July 8, 1986.

Mark L. Rodgers, Kief, Fuller, Baer, Wallner & Rodgers, Ltd., Bemidji, for appellant father.

Timothy R. Faver, Keyes & Faver, Bemidji, for Beltrami Cty.

Mary Kay Klein, Smith, Carpenter, Benshoof & Klein, Bemidji, for respondent S.G.

Neal R. Scharmer, McRae & McRae, Bemidji, for appellant mother.

Jennifer R. Wellner, Duranske & Wellner, Bemidji, for respondent K.G.

Heard, considered, and decided by LESLIE, P.J., and FOLEY and WOZNIAK, JJ.

## OPINION

WOZNIAK, Judge.

Mr. G. (father) and Mrs. G. (mother) appeal from an order of the district court, Beltrami County, adjudicating their two daughters, S.G. and K.G., to be neglected children as defined by Minn.Stat. § 260.-015, subd. 10 (b) and (e) (Supp.1985), and from the dispositional order of the court. We affirm.

## FACTS

Mr. G. and Mrs. G. have three children. In January 1985, when the neglect petition was filed in this case, S.G. was fifteen and K.G. was eleven. The youngest child, D.G., a son, was two.[1] The petition alleges numerous acts of sexual abuse perpetrated by Mr. G. upon his oldest daughter, S.G.

On January 2, 1985, Mr. G. informed his daughters that household discipline was going to be enforced more strictly in the future. He and his wife then left to go shopping. After they left, S.G. packed up some of her things and went to the home of an adult friend a few miles away. S.G. told her friend, who had previously suspected sexual abuse in S.G.'s household, that her father had been sexually abusing

---

1. S.G.'s date of birth is April 17, 1969, K.G.'s is    May 26, 1973, and D.G.'s is April 1, 1982.

her. The friend called Beltrami County Social Services, who in turn called the sheriff's department.

A sheriff's department investigator spoke with S.G. that day. She told him that her father had been sexually abusing her since she was in the fourth or sixth grade. According to S.G., the abuse started when her father sought to explain the facts of life to her. As he did so, he began giving her "examples" of what he was talking about, and touched her on her breasts and in her genital area. The activity continued from that point and progressed to the stage where he had intercourse with her when she was ten or twelve. After that, he had intercourse with her about once a week. The intercourse took place in her bedroom at home, usually at night. S.G. told the investigator that when her father had intercourse with her, he used a prophylactic, and sometimes contraceptive foam.

By this time, S.G.'s parents had returned home and were looking for her. The sheriff's department called them at home and asked them to come to the Beltrami County Law Enforcement Center, where they both gave voluntary statements denying the abuse occurred. Mr. G. was taken into custody and placed in the Beltrami County jail.

The investigators went to the family's home that evening, executed a search warrant, and interviewed S.G.'s twelve-year-old sister, K.G. K.G. stated that she had shared a bed with her sister until about two years ago. She said that her father would climb into the bed at night and kiss S.G. and get on top of her. She said that her father would have no clothes on and that her sister had her nightgown pulled up.

About two years before the petition was filed, in March of 1983, K.G. was interviewed in the principal's office at her school by Gail Hendershot, a county social services worker. K.G. told Ms. Hendershot that her father had been having sex with S.G. since S.G. was in about the third grade; that her father would climb into bed and climb over her to get to S.G.; that S.G. cried or had a stomachache or headache after intercourse; that her mother sent K.G. out of the house on one occasion so that the father could abuse S.G.; that once, on a trip, the father and S.G. had gone into the woods and had come out carrying a blanket.

On January 11, 1985, the court found probable cause that a juvenile protection matter existed as to S.G. and K.G., and ordered that custody of S.G. be placed with the county for placement in foster care; that custody of K.G. be placed with her mother; that the father have no contact with either child; and that he stay out of the community in which K.G. and her mother resided. The mother voluntarily placed K.G. in a foster home. On March 1, 1985, the court found that probable cause existed that K.G. would be endangered if returned to her mother's custody, ordered K.G.'s custody placed in the county, and ordered that she be evaluated at the Range Mental Health Center in Virginia to determine if she was the victim of sexual abuse.

The case was tried to the court in two phases. The first phase involved determining whether S.G. and K.G. were neglected within the meaning of the statute. This phase of the case commenced on March 18, 1985, and concluded on July 19. On September 13, an order was issued, finding that the allegations of the petition had been proven by clear and convincing evidence. The second phase, the dispositional hearing, commenced on October 3. The disposition order was issued on December 20.

(a) *S.G.:*

At the neglect hearing, S.G. reiterated in more detail the allegations she had made to the sheriff's department investigators. Her testimony was corroborated by Dr. John Parkin, a pediatrician and member of the Bemidji Child Protection team. Dr. Parkin conducted a physical examination of S.G. and determined that she had engaged in sexual intercourse on numerous occasions, at least 20 to 30 times, and possibly many more.

K.G., however, retracted the statements she had made to the investigators and testified that she had no knowledge of sexual abuse of S.G. by her father.[2]

Mr. G. claimed at trial that he is impotent and had been unable to have sexual relations for about 3½ years before the trial. Despite this, he and his wife had a baby, D.G., in April 1982. Mr. G. stated that D.G. was conceived by means of artificial insemination, which they practiced themselves at home using instruments purchased by Mr. G.

When S.G. left home in January 1985, Mrs. G. told the investigators that she and her husband had sexual relations every night. At trial, however, she testified that they had not had intercourse for eight years before D.G. was born and that she was trying unsuccessfully to get pregnant all this time.

When the sheriff's department executed the search warrant at the parties' home on the night of January 2, 1985, they discovered several packages of prophylactics and contraceptive foam. These items were not kept in the parents' bedroom, but in a desk drawer in the living room. In explaining the presence of contraceptives in a home in which no intercourse had allegedly taken place for eight years and in which Mrs. G. was desperately trying to get pregnant, Mrs. G. testified that she and her husband used the contraceptive foam as a lubricant. Mr. G. testified that the prophylactics were used in the artificial insemination process and for purposes of stimulation.

Mr. G.'s expert, Dr. William Furlow of the Mayo Clinic, testified that Mr. G. has an organic erectile dysfunction. He would not state that Mr. G. was incapable of sexual intercourse. He testified that he had no way of determining whether Mr. G. was impotent at any time prior to the actual examination which was conducted four months after the last incident of alleged sexual abuse.

(b) *K.G.:*

K.G. was determined to be neglected based on the testimony of Dr. Claire Bell, a psychologist at the Range Mental Health Center in Virginia. Dr. Bell testified that, based on her extensive examination of K.G., K.G. exhibited many of the characteristics of a secondary victim of sexual abuse, i.e., a sibling in a family where sexual abuse has occurred, but who has not been directly approached sexually.[3]

In its order dated September 13, 1985, the trial court found that the allegations of the neglect petition had been proven by clear and convincing evidence and adjudicated S.G. and K.G. neglected pursuant to Minn.Stat. § 260.015, subd. 10 (b) and (e).

(c) *The disposition hearing:*

After considering foster home placement reports and recommendations from Beltrami County Social Services and Dr. Bell, the court issued its dispositional order on December 20, 1985. The court ordered, inter alia, that legal custody of S.G. and K.G. be placed in the county for initial placement in foster homes; that the daughters begin psychological examination and treatment; that neither S.G. nor K.G. return home until treatment for the family has progressed to the point that replacement in the home is appropriate; and that neither Mr. nor Mrs. G. have any contact with either daughter until further order of the court.

(d) *Child support, termination of court-appointed attorneys, and transcript costs:*

A hearing regarding child support was held in March 1985. At that time, the court ordered that Mr. and Mrs. G. assign to Beltrami County social security benefits in the amount of $94 per month, attributable to S.G. and K.G., to reimburse the county for costs of foster care. The court also ordered that Mr. G. pay $185 per

---

2. After the trial, K.G. retracted her trial testimony and, at a hearing conducted on March 26, 1986, testified that the abuse of S.G. had occurred and that she, K.G., had been aware of it.

3. These characteristics include family isolation; lack of a desire to grow up; feelings of guilt and shame; increased household activities; anger; psuedo-Maturity; poor self and body image; dependence; unmet emotional needs; and extremism regarding sexual activities.

month as foster care support for both daughters, and that Mrs. G. pay 10% of her monthly income as foster care support. These amounts were based on Mr. G.'s affidavit stating that his income was $926 per month for 1984 ($11,112 per year) and $959 per month for the first two months of 1985.

In August 1985, the petitioners brought a motion to increase child support and terminate Mr. G.'s right to his court-appointed attorney, alleging that Mr. G. had submitted false information in his March affidavit.[4] Mr. G. submitted an affidavit admitting that the March figures were incorrect. The affidavits submitted by the petitioners and Mr. G. indicate that his total monthly income in 1984 was $1,247, or $14,964 per year. With legally-mandated cost-of-living increases, his 1985 income was $1,341 per month, or $16,092 per year.

On September 9, 1985, the court ordered Mr. G.'s child support increased to $350 per month, retroactive to March 15, the date of the first payment under the original order. The court found that there was sufficient monthly income for Mr. G. to retain private counsel and therefore rescinded his appointments of the two attorneys representing Mr. and Mrs. G.

At the dispositional hearing on October 3, 1985, the two attorneys appeared pro bono for their clients. In November, Mr. and Mrs. G. brought a motion for reinstatement of their court-appointed attorneys, waiver or reimbursement of filing fees, and the payment at public expense of the cost of transcript preparation for this appeal. The trial court denied all requested relief and found that appellants are not indigent. The court ruled, however, that the transcript would be prepared at public expense with Mr. G. to reimburse the public at the rate of $100 per month.

The appellants renewed their motion in this court. Because the filing fees had already been paid, the transcript was already being prepared, and the appellants are currently represented by counsel, this court, by order dated December 17, 1985, ruled that decision on appellants' motion to proceed in forma pauperis was deferred until consideration of this appeal on the merits, and that counsel shall not withdraw or discontinue their representation during the pendency of this appeal.

## ISSUES

1. Does appellants' failure to move for a new trial preclude appellate review of alleged evidentiary and procedural errors occurring at trial?

2. Are the trial court's findings that S.G. and K.G. are neglected children supported by clear and convincing evidence?

3. Is the disposition ordered by the trial court supported by sufficient findings and in the best interests of S.G. and K.G.?

4. Did the trial court abuse its discretion in setting child support?

5. Did the trial court abuse its discretion in terminating appellants' court-appointed counsel and denying appellants' motion to waive filing fees and transcript costs for this appeal?

## ANALYSIS

### 1. *Failure to move for a new trial:*

■ Appellants allege reversible error in numerous evidentiary rulings by the trial court. However, neither appellant moved for a new trial. The Minnesota Supreme Court has recently reaffirmed the well-established rule that objections to evidentiary rulings which were not assigned as error in a motion for a new trial are not reviewable by this court on appeal. *Sauter v. Wasemiller*, 389 N.W.2d 200 (Minn.1986). This rule applies notwithstanding that appel-

---

**4.** The discrepancy was due to the fact that Mr. G. reported in his March affidavit that he received $408 per month in workers' compensation benefits. In fact, he received $408 every two weeks. His net monthly workers' compensation income in 1984 was therefore $884 ($408 times 26 pay periods divided by twelve months). He received an additional $363 per month in social security benefits, for a total net monthly income of $1,247. None of this income is taxable.

lants made timely objections at trial. *Id.* at 202.

New trials may be granted in dependency and neglect proceedings pursuant to Minn.R.P.Juv.Ct. 60. By failing to give the trial court an opportunity to correct its alleged errors, appellants are precluded from raising these issues on appeal.

Because appellants failed to move for a new trial, our scope of review is limited to the sufficiency of the evidence and the adequacy of the findings to support the conclusions of law. *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976).

### 2. *The neglect order:*

■ Rule 59.05 of the Minnesota Rules of Procedure for Juvenile Court provides that the allegations in a neglect petition must be proven by clear and convincing evidence. Mindful of this standard, the trial court in its order dated September 13, 1985 specifically found that "the allegations of the petition have been proved by clear and convincing evidence."

The trial court's factual findings are entitled to the same weight on review as a jury verdict and will not be set aside unless clearly erroneous. *State v. Vail*, 274 N.W.2d 127, 133 (Minn.1979); *In re V.R.*, 355 N.W.2d 426, 430 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. Jan. 11, 1985).

The trial court's findings here are not clearly erroneous. The record does support, with clear and convincing evidence, the trial court's finding that S.G. and K.G. are neglected children.

S.G. has maintained the truth of her allegations for over a year, since January of 1985. Despite appellants' allegations to the contrary, a review of her testimony in the transcript reveals no material inconsistencies. Her testimony was detailed, emphatic, and unimpeached. Her testimony was corroborated by the medical testimony of Dr. Parkin and the psychological testimony of Dr. Bell, which indicated that K.G. was a secondary victim.

Mr. and Mrs. G. emphatically denied the occurrence of sexual abuse between Mr. G. and S.G. However, their testimony regarding the presence of contraceptives in their home, when Mr. G. was allegedly impotent and the couple was desperately trying to have a baby, lacks credibility. Furthermore, as noted above, Mrs. G.'s testimony at the hearing was inconsistent with statements she made to the investigating officers.

This court must give due regard to the trial court's opportunity to observe and judge the credibility of the witnesses. Minn.R.Civ.P. 52.01. In his memorandum dated December 20, 1985, the trial court stated:

> The decision depends, ultimately, on which version the Court believes. After careful consideration of all the evidence, the Court is well satisfied that the testimony of [S.G.] is believable and that of [Mr. G.] is not.

In light of the finding that Mr. G. was sexually abusing S.G., the finding that K.G. is a neglected child was not clearly erroneous. This finding is supported by Dr. Bell's expert testimony that K.G. was a secondary victim of the abuse.

### 3. *The disposition order:*

■ In light of the court's finding that the sexual abuse occurred, the court's disposition of this matter is supported by the evidence and clearly designed to serve the best interests of the children. Rule 62.05 of the Rules for Juvenile Court provides:

> The disposition order made by the court shall contain written findings of fact to support the disposition ordered and shall also set forth in writing the following information:
>
> (a) a disposition plan, and
>
> (b) why the best interests of the child are served by the disposition ordered, and
>
> (c) what alternative dispositions were recommended to the court and why such recommendations were not ordered.

The trial court's disposition order meets these requirements. First, the order sets

forth a disposition plan. Second, it states that:

> In light of the Court's finding that the children are neglected, this disposition serves the best interests of the children. Until such time as treatment has been provided for the entire family, it is in the children's best interests to not have contact with their father, who has sexually abused one of them, or their mother, who refuses to accept the finding of the Court that the children are neglected.

Third, the order indicates that the court did consider an alternative disposition of returning K.G. to the family home on condition that Mr. G. move out. The order states that this alternative was not ordered because it was deemed unacceptable to Mr. and Mrs. G. The order further states that, with respect to S.G., no alternative disposition was suggested.

In light of the facts of this case and the clear and convincing evidence of sexual abuse, a disposition along the lines of that ordered by the trial court would seem to be the only realistic alternative.

One of the purposes of the neglect statute is to create a temporary remedy, with the ultimate goal of returning the child to her natural parents. *In re Solomon,* 291 N.W.2d 364, 369 (Minn.1980). There is therefore a presumption that natural parents should be entrusted with the care of their children, and they should only be deprived of that custody for "grave and weighty reasons." *Id.* Such grave and weighty reasons exist here. It is totally inconceivable that it would be in the best interests of S.G. and K.G. to be returned to the custody of their natural parents in light of the court's finding of sexual abuse.[5]

4. *Child support:*

■ Minnesota Statutes section 260.251 (1984) provides that, when legal custody of a child is transferred to a county welfare board, the court shall order the parents to use the total income attributable to the child, including social security benefits, to reimburse the county for the foster care. *Id.,* subd. 1(b). If this is insufficient to reimburse the county for the full cost of the care,

> the court shall inquire into the ability of the parents to support the child and, after giving the parents a reasonable opportunity to be heard, shall order the parents to reimburse the county, in the manner and to whom the court may direct, such sums as will cover in whole or in part the cost of care, examination, or treatment of the child.

*Id.,* subd. 1(c).

The trial court, in addition to assigning social security benefits attributable to S.G. and K.G. to the county, ordered Mr. G. to pay $350 per month child support. This figure was arrived at in part by applying the child support guidelines, Minn.Stat. § 518.551, subd. 5 (1984).

This court will not reverse a determination of child support in the absence of a clear abuse of discretion. *Pitkin v. Gross,* 385 N.W.2d 367, 368 (Minn.Ct.App.1986). There was no such abuse of discretion here. Although Minn.Stat. § 260.251 does not require application of the child support guidelines in ordering the reimbursement of foster care expenses, it is not an abuse of discretion for the trial court to look to the guidelines for guidance in setting a reasonable figure.

5. *Termination of court-appointed counsel, denial of waiver of filing fees and transcript costs:*

■ Mr. G. has nontaxable income of approximately $1,400 per month. The trial court did not clearly err in determining that appellants are not indigent. The trial court's denial of appellants' motions was not clearly erroneous.

### DECISION

The trial court is affirmed in all respects.

---

5. Mr. G. has been charged with criminal sexual conduct for his abuse of S.G. As one of the conditions of his release on recognizance, he has been ordered by the court to have no contact with her.