*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-0960**

In the Matter of the Welfare of the Child of: J. B. T., Parent.

**Filed October 27, 2014**
**Affirmed**
**Stauber, Judge**

Clay County District Court
File No. 14JV134102

Timothy H. Dodd, Detroit Lakes, Minnesota (for appellant)

Brian J. Melton, Clay County Attorney, Johnathan R. Judd, Assistant County Attorney, Moorhead, Minnesota (for respondent)

Laurie Christianson, Moorhead, Minnesota (guardian ad litem)

Considered and decided by Kirk, Presiding Judge; Hudson, Judge; and Stauber, Judge.

### U N P U B L I S H E D   O P I N I O N

**STAUBER**, Judge

On appeal from the termination of her parental rights to her child, appellant-mother argues that the record lacks clear and convincing evidence supporting the district court's determinations that (1) appellant is palpably unfit to be a party to the parent and child relationship; (2) appellant failed to correct the conditions that led to the out-of-home placement; and (3) the child is neglected and in foster care. We affirm.

**FACTS**

Appellant J.B.T. is the mother of D.T., who was born on September 29, 2008. D.T.'s father is unknown. In 2000, appellant suffered a traumatic brain injury in a car accident. She also suffers from chronic mental-health issues and has been diagnosed with Bipolar Disorder, Generalized Anxiety Disorder, Attention Deficit Hyperactivity Disorder, Post-Traumatic Stress Disorder, Adjustment Disorder with Depression, and Personality Disorder.

Appellant's mental-health issues led to D.T.'s out-of-home placement in February 2013, following a report that D.T. was possibly neglected or abused. Healthcare professionals observed a "small bruise" under D.T.'s eye, which D.T. indicated was caused when his mother "spanked" him. Officers investigating the report interviewed appellant at her apartment. According to the officers, the apartment was in "general disarray" and emitted an "unpleasant odor." In speaking with the officers, appellant spoke irrationally, telling the officers that "she was related to the Queen of England" and that she was "royalty," mentioning that she "needed to take down Exxon Mobile Oil company and Halliburton company because they were negatively impacting people's lives," and stating that she "is friends and speaks to Senator Al Franken as well as other friends and acquaintances of power in Washington DC." When asked about D.T.'s bruise, appellant failed to give a definitive explanation, but speculated that a "TV had fallen and maybe the antenna had struck him."

The officers determined that an emergency placement of D.T. outside of the home was appropriate under the circumstances. An emergency protective care hearing was

then held on February 22, 2013, in the Clay County District Court, after which D.T. was ordered into foster care. A case plan was developed and provided to appellant, which required her to (1) complete a parental capacity evaluation and follow the resulting recommendations; (2) demonstrate an ability to develop and implement a safety plan; (3) consistently follow the recommendations of social services and service providers; (4) participate in therapy; and (5) cooperate, consistently engage in, and actively participate in services with service providers.

On December 10, 2013, respondent Clay County filed a petition to terminate appellant's parental rights to D.T., asserting that appellant's parental rights should be terminated under Minn. Stat. § 260C.301, subd. 1(b)(4) (2012) (palpably unfit to be a party to the parent-child relationship); Minn. Stat. § 260C.301, subd. 1(b)(5) (2012) (reasonable efforts have failed to correct conditions that led to placement of child); and Minn. Stat. § 260C.301, subd. 1(b)(8) (2012) (child neglected and in foster care).

At trial, evidence was submitted demonstrating that appellant completed a parental capacity evaluation (PCE) with Dr. John Molestre in March 2013, and had a personal interview in April 2013. Dr. Molestre recommended that appellant "see an individual therapist on a regular basis," that she "continue to involve herself with psychiatric services," and that she work with an "experienced family therapist." Dr. Molestre concluded that "ultimately reunification will depend on [appellant's] willingness to accept the provisions of her case plan, work with therapists, including an experienced family therapist that [is] available to her, and demonstrate through supervised and ultimately unsupervised visits with [D.T.] that she is meeting his needs . . . ."

3

The evidence also established that after appellant's case plan was implemented, she consistently changed mental-health therapists. Appellant initially began seeing Cheryl Toutges for individual therapy on February 26, 2013, but appellant discontinued her services with Toutges after four sessions. In the summer of 2013, appellant began seeing Cathy Hjelle for mental-health therapy. But Hjelle discontinued her services with appellant after a few weeks when appellant failed to attend four of her six scheduled appointments.

In the late summer and early fall, appellant sought online counseling, paying out-of-pocket for these services. Appellant then began seeing psychiatrist Dr. Emmett Kenney, Jr. in September 2013. According to Dr. Kenney, appellant scheduled four appointments after the initial evaluation, but he saw her only twice. Dr. Kenney then sent appellant a termination letter in November 2013 due to her failure to follow-through with appointments. Dr. Kenney concluded that appellant has limited judgment and insight into her mental-health needs and that she is at high risk for not completing mental-health services.

Also in September 2013, appellant relocated to Fargo, North Dakota. The move significantly impacted appellant's access to services by complicating insurance issues. As a result, while appellant was living in Fargo, she was on a waiting list to receive mental health services. She subsequently moved back to Minnesota and began seeing Dr. Carolyn Klehr for individual therapy in February 2014. Appellant was still seeing Dr. Klehr at the time of trial.

Appellant also participated in supervised visitation with D.T. These visits were initially set up through Rainbow Bridge, but in June 2013, the agency declined to continue providing services to appellant. According to the executive director of the agency, the services were discontinued due to obscene language used by appellant and perceived threats made by appellant toward staff members.

After Rainbow Bridge stopped offering services to appellant, the supervised visitation was moved to the Social Services Building in Moorhead. According to Alex Ishaug, a county child protection worker, appellant's visits with D.T. were "inconsistent," meaning some were good, but "there were others where the concerns were raised." Ishaug testified that D.T. "can be a pretty hard kid to manage or to parent," and that when he would "act[] out," appellant would sometimes just leave and end the visit.

Evidence was also presented regarding D.T.'s mental-health treatment and needs. D.T. has been diagnosed with Pervasive Development Disorder and Attention-Deficit Hyperactivity Disorder (ADHD). Dr. Amador Dizon, D.T.'s psychiatrist, testified that D.T. is a "very special-needs child" and can be a "really difficult child to take care of." Dr. Dizon opined that, as a result, "even the more experienced foster parents" have not been "able to handle" him. Dr. Dizon further testified that D.T. "needs almost one-to-one supervision." At the time of trial, D.T. was in his fourth foster-home placement, and no permanency options had yet been identified for him.

The district court found no evidence that appellant abused D.T. and that the state of appellant's "home at the time of [D.T.'s] removal is not relevant . . . because this is not a 'messy house' case." But the district court concluded that appellant is "palpably unfit

to be a party to the parent and child relationship" due to her "chronic and severe mental health issues and her inability to properly care for and manage herself independently, which is of a duration or nature that renders her unable for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotion needs of" D.T. The district court also concluded that "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to [D.T.'s] placement." Therefore, the district court determined that the "grounds for termination have been proven by clear and convincing evidence" under Minn. Stat. § 260C.301, subd. 4(b)(4), (5), (8), and that "it is in [D.T.'s] best interest to grant the termination petition as to [appellant]." This appeal followed.

**D E C I S I O N**

"[P]arental rights may be terminated only for grave and weighty reasons." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 709 (Minn. App. 2004). "The court must make its [termination] decision based on evidence concerning the conditions that exist at the time of termination and it must appear that the conditions giving rise to the termination will continue for a prolonged, indeterminate period." *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007) (quotation omitted). An appellate court "exercises great caution in termination proceedings, finding such action proper only when the evidence clearly mandates such a result." *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996). On appeal, this court examines the record to determine whether the district court applied the appropriate statutory criteria and made findings that are not clearly erroneous. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). The

6

reviewing court gives the district court's decision considerable deference, but "closely" inquires "into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). An appellate court affirms the district court's termination of parental rights "when at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, provided that the county has made reasonable efforts to reunite the family."[1]  *Id.* (citations omitted).

## I.     Palpable unfitness

The district court concluded that appellant is palpably unfit to parent D.T. under Minn. Stat. § 260C.301, subd. 1(b)(4).  This statute provides that a juvenile court may terminate parental rights when it finds

> that a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

*Id.*

The Minnesota Supreme Court has held that the burden under this statute is onerous and that "[t]he petitioning party must prove a consistent pattern of specific conduct or specific conditions existing at the time of the hearing that appear will continue for a prolonged, indefinite period and that are permanently detrimental to the welfare of

---

[1] Appellant does not challenge the district court's best interests determination.

7

the child." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008) (quotation omitted). "In each case, the actual conduct of the parent is to be evaluated to determine his or her fitness to maintain the parental relationship with the child in question so as to not be detrimental to the child." *S.Z.*, 547 N.W.2d at 892 (quotation omitted). The focus of the district court in evaluating palpable unfitness should not be on past history, but the projected permanency of the specific conditions that render the parent unable to care for a child. *In re Solomon*, 291 N.W.2d 364, 368 (Minn. 1980). In order to support termination of a parent's rights, the specific conditions relied on by the district court must have a causal connection to the parent's inability to care for the child. *T.R.*, 750 N.W.2d at 662-63.

In *In re Welfare of Children of B.M.*, this court stated that mental illness alone is insufficient to show that parental rights should be terminated; rather the mental illness must directly affect the ability to parent. 845 N.W.2d 558, 563 (Minn. App. 2014). Appellant argues that, like in *B.M.*, there is no evidence demonstrating a connection between her "mental health issues and any of her child's behaviors." Thus, appellant argues that the district court erred by concluding that she is palpably unfit to be a party to the parent and child relationship.

We acknowledge that the evidence demonstrating that appellant's mental illness directly affects her ability to parent D.T. is not overwhelming. The record reflects that despite switching mental-health therapists several times, resulting in sporadic attendance in mental-health therapy, appellant did participate in therapy and, in fact, had been consistently attending therapy sessions with Dr. Klehr for a few months prior to the

8

termination trial. The record also reflects that appellant consistently attended the supervised visits with D.T., and that many were "good" visits. And although appellant had visits with D.T. that raised "concerns," with the social workers, the record indicates D.T. is "a very special-needs child" and can be "challenging for any parent."

Nonetheless, appellant's reliance on *B.M.* is misplaced because the facts in *B.M.* are distinguishable from the facts presented here. In *B.M.*, the father, C.G., whose parental rights were terminated, was an adult with below-average intellectual functioning who lived with his mother. *Id.* at 560-61. A licensed psychologist who performed a parenting assessment for C.G. and C.G.'s mother testified that "[C.G.] together with [his mother] could co-parent effectively." *Id.* at 561. The psychologist also testified that despite his mental deficiencies, C.G. "is capable of learning in a 'slower way than other people' and that he is 'motivated to learn when it comes to parenting.'" *Id.* at 565. Moreover, a county caseworker testified that C.G. "understands the basic concepts of parenting . . . and . . . did a really nice job of playing with [his child] and engaging her." *Id.* at 564-65. And, importantly, C.G. "recognized his shortcomings and . . . obtained the necessary help." *Id.* at 565.

Here, unlike in *B.M.*, record reflects that appellant has very little insight into her mental-health issues, fails to understand how these issues affect D.T., and does not understand and recognize her own need for services. In fact, the record reflects that appellant has consistently failed to follow through with her mental-health treatment by repeatedly canceling or failing to attend appointments. And appellant further compounded this problem when she temporarily moved to Fargo, which complicated her

9

ability to receive mental-health services. As a result, appellant's mental-health therapists were constantly changing, precluding the much-needed treatment and therapy.

Moreover, unlike in *B.M.*, appellant does not cohabitate with someone who can compensate for her mental-health deficiencies and help her co-parent D.T. Further, the record reflects that D.T. is a very difficult child, which presents additional challenges for a single parent with mental-health needs. Finally, unlike in *B.M.*, the record reflects that here, "concerns were raised" following some of appellant's supervised visits with D.T. because appellant would "sometimes just leave and end the visit" when D.T. "would act[] out." This evidence indicates that appellant fails to understand the nature of D.T.'s mental-health needs and demonstrates appellant's inability to effectively parent D.T. when he acts out. *See In re Child of P.T.*, 657 N.W.2d 577, 591 (Minn. App. 2003) (concluding that district court did not clearly err in making determination of palpable unfitness given, in part, evidence of parents' lack of emotional connection with child and their failure to understand parenting deficits), *review denied* (Minn. Apr. 15, 2003). Accordingly, because there is clear and convincing evidence supporting the district court's findings underlying its determination that appellant's parental deficiencies in caring for D.T.'s mental and emotional needs will continue for the foreseeable future, the district court did not err by concluding that appellant is palpably unfit to be a party to the parent and child relationship.

## II.     Correcting conditions leading to placement

The district court also found clear and convincing evidence to terminate appellant's parental rights to D.T. under Minn. Stat. § 260C.301, subd. 1(b)(5).  That statute provides that a juvenile court may terminate a parent's rights to a child if it finds "that following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement."  *Id.*  It is presumed that reasonable efforts have failed if (1) the child is under eight years old and has been in placement for more than six months, unless the parent has maintained regular contact with the child and is complying with the case plan; (2) there is a court-approved case plan; (3) the conditions that led to the out-of-home placement have not been corrected; and (4) the social services agency has made reasonable efforts to reunite the family.  *Id.*

Appellant does not dispute that the county provided reasonable services.  But appellant argues "that the fact that she was actively receiving services that were recommended at the time of trial should have been reason enough not to terminate appellant's parental rights."[2]  We disagree.

Minnesota law provides that a parent may comply with a case plan but nevertheless fail to correct conditions leading to out-of-home placement.  *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 89 (Minn. App. 2012); *see In re Welfare of Maas*, 355 N.W.2d 480, 483 (Minn. App. 1984) (affirming that mother's substantial compliance

---

[2] The county acknowledged at oral argument that it stopped providing services to appellant after her parental rights were terminated.  Thus, no services were available during this appeal.

11

with court-ordered parenting sessions, psychological treatment, and sobriety were insufficient to avoid termination given her negative parenting history and poor prognosis for long-term improvement). The critical issue is not whether the parent formally complied with the case plan, but rather whether the parent is presently able to assume the responsibilities of caring for the child. *In re Welfare of J.L.L.*, 396 N.W.2d 647, 651 (Minn. App. 1986).

The record reflects that appellant consistently failed to follow through with her mental health treatment, disagreed with her mental-health diagnosis, and generally demonstrated a lack of understanding of her mental-health needs. Although appellant began to satisfy some of her case-plan requirements by consistently attending therapy a few months before the termination trial, the evidence presented at trial demonstrates that appellant was consistently uncooperative and made little progress in addressing her mental-health issues. Moreover, although appellant consistently attended her supervised visits with D.T., the record reflects that she struggled to use effective behavior-management skills when D.T. acted out, would sometimes leave the visits when D.T. had a tantrum, and never progressed beyond supervised visitation with D.T. Appellant's failure to adequately address her mental-health needs, in conjunction with her failure to demonstrate an ability to manage D.T.'s behavioral and mental-health issues, shows that she is unable to assume the responsibilities of caring for D.T. Accordingly, there is clear and convincing evidence that appellant's parental rights should be terminated because of her failure to correct the conditions leading to the out-of-home placement.

### III. Neglected and in foster care

The district court found that D.T. was neglected and in foster care under Minn. Stat. § 260C.301, subd. 1(b)(8), which also serves as a basis for terminating a parent's rights to her child. A child is neglected and in foster care if the child (1) is in court-ordered out-of-home placement; (2) cannot be returned home because of its parents' "circumstances, condition, or conduct"; and (3) cannot return home because the parents have failed to make reasonable efforts to adjust their circumstances, condition, or conduct. Minn. Stat. § 260C.007, subd. 24 (2012).

Here, D.T. is in court-ordered out-of-home placement and cannot be returned to appellant's care and custody due to her mental illness. Moreover, the record reflects that appellant has failed to adequately address or make progress with regard to her mental-health issues. Therefore, the district court did not err by concluding that D.T. was neglected and in foster care.

**Affirmed.**

13