In the Matter of the WELFARE OF THE CHILDREN of B.M., J.M. and C.G., Parents.

No. A13–2025.

Court of Appeals of Minnesota.

April 21, 2014.

Timothy H. Dodd, Detroit Lakes, MN, for appellant C.G.

Michael D. Fritz, Becker County Attorney, Jennifer R.J. Knutson, Assistant County Attorney, Detroit Lakes, MN, for respondent Becker County.

Julie Jones, Callaway, MN, guardian ad litem.

Considered and decided by STAUBER, Presiding Judge; HUDSON, Judge; and RANDALL, Judge.[1]

## OPINION

STAUBER, Judge.

On appeal from the termination of his parental rights, appellant-father challenges the district court's determination that he is a palpably unfit parent, arguing that he was not given an opportunity to parent his child because the county failed to undertake reasonable efforts to reunite him with his daughter. He also argues that the district court erred by concluding that his mental impairment alone was sufficient evidence of palpable unfitness. We reverse and remand.

## FACTS

This case involves the termination of parental rights of a noncustodial father, appellant C.G., to his daughter, S.O., born August 21, 2011. Appellant is an adult with below-average intellectual functioning. Appellant has an IQ of about 73. Appellant receives assistance with independent living through the county. He has an adult-protection services provider from whom he receives about ten hours of services per month. Those services have helped appellant improve his grooming and domestic skills. He also has a representative payee to help him manage his money. Appellant was formerly employed at a sandwich-shop chain and a department store where he was entrusted with opening

---

1. Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

and closing both stores in addition to other job duties; however, he left that employment around the time this court matter was initiated. Appellant now supports himself financially with Retirement Survivors and Disability Insurance (RSDI) benefits. Appellant lives with his mother, C.H.

In 2010, appellant became acquainted with a woman, B.M. The two began dating and moved in together in 2011. The couple lived together for about six months during which time B.M. became pregnant. After appellant learned that B.M. had been taking advantage of him, he no longer trusted her and asked her to move out. B.M. moved back to Missouri where her husband, J.M., was just released from jail. On August 21, 2011, B.M. gave birth to a daughter, S.O. Because B.M. and J.M. were married, J.M. was the presumed father of S.O. But genetic testing later confirmed that appellant was the biological father of S.O. In early 2012, B.M., J.M., the couple's two children, and S.O. moved back to Minnesota, allowing appellant to see his daughter for the first time. B.M. allowed appellant to have weekend visits with S.O.

In March 2012, the county child protection services agency became concerned about the children in B.M. and J.M.'s care. They observed that the children were being subjected to chronic neglect, that B.M. was not providing proper nutrition or care, and that S.O. was underweight. B.M. and J.M. have a long history with child protection, and prior to this case, their parental rights were terminated to two of their older children. During the pendency of this case, another child was born to B.M. who was voluntarily given up for adoption. Altogether, B.M. has given birth to six children, none of whom are in her care.

In April, B.M. voluntarily placed her three remaining children in foster care, but by June, B.M. requested that the children be returned. B.M. continued to fail to provide proper care for her children, and the county filed a CHIPS petition in July. Pursuant to a court order, S.O. and her half-siblings, R.M. and A.O., were placed together in a foster home. During a review hearing in October 2012, and following a determination that appellant was the biological father of S.O., appellant sought to become a party to the CHIPS proceeding.

A case plan was developed that permitted appellant to have weekly supervised visits, and parenting classes were offered. A six-month permanency plan was also developed. Appellant completed all the requirements of the case plan. But on June 26, 2013, the county filed a petition for termination of parental rights (TPR) seeking to terminate the rights of B.M., J.M., and appellant to S.O. B.M. and J.M. consented to the involuntary termination of their parental rights. The issue of appellant's parental rights was tried before the district court on August 29 and September 19, 2013.

The county's witnesses testified that appellant and S.O. have a good relationship and that it is in the child's best interest to maintain that relationship, but that appellant is not fit to parent on his own. Jill Esser, the county case-worker, testified that appellant had a good relationship with S.O. and that appellant "deserves to see her and be involved in her life," but that as a parent he would present a high risk for S.O. because of his mental impairment. Dr. Mary Frenzel, the licensed psychologist who performed the parenting evaluation for appellant and his mother, C.H., testified that appellant's relationship with his daughter is beneficial to S.O. but that appellant cannot parent "24/7." Dr. Frenzel testified that appellant together with C.H. could co-parent effectively, but Dr. Frenzel was concerned that C.H. had sig-

nificant health issues. Dr. Frenzel recommended that the county provide additional services, but Esser testified that no such services exist "for a parent who has significant cognitive limitation to offer hours each week until a child turns 18." Julie Jones, the guardian ad litem for S.O. testified that appellant is a good father and that he needs to be in his daughter's life, but that termination was nevertheless in S.O.'s best interest because S.O. should remain with her half-siblings in foster placement.

The county's witnesses expressed concerns about past and future events that might impact appellant's ability to parent. Esser testified that appellant was "living in absolute filth" for a time with his brother, who was later arrested on child pornography charges. But she conceded that appellant's hygiene and cleanliness issues have been resolved and that appellant had nothing to do with his brother's illegal activities. Dr. Frenzel testified that appellant lacks good judgment regarding the people he associates with because certain people had taken advantage of him in the past. Jones testified that due to appellant's mental impairment, his daughter would soon surpass appellant's mental abilities making it less likely that he could provide for his daughter's needs.

Appellant testified that he does not believe he is an unfit parent and that he wants to raise S.O. He stated that he is self-employed, working odd jobs, and that he is pursuing his G.E.D. Appellant's former employer, Bruce Omang, testified that appellant was a competent employee who was responsible for opening and closing two retail stores, as well as performing a variety of maintenance and construction work. Appellant testified that, while he was living with his mother, B.M. permitted him to have S.O. for the weekend numerous times without incident prior to the

CHIPS proceeding. He also testified that if he encountered problems while parenting he would seek advice from his mother or from the county. He stated that he would be willing to have the county check in on him and S.O. He asked the court to "give [him] a chance to be a father."

The district court granted the county's petition to terminate appellant's parental rights. The district court found that appellant engaged with county services and fully completed his case plan but that his "cognitive deficiencies preclude him from having [S.O.] in his custody on a full time basis." The district court also found that it was in the best interests of S.O. to remain with her half-siblings and with "a new family that can provide the type of stability and safety that [appellant] is unable to provide now or in the future." This appeal followed.

## ISSUES

I. Did the district court abuse its discretion by terminating appellant's parental rights to his child because the county failed to present clear and convincing evidence that appellant's mental impairment renders him palpably unfit to be a party to the parent and child relationship?

II. Did the district court err by failing to find that the county undertook reasonable efforts to reunite appellant-father with his child?

## ANALYSIS

On appeal from a termination of parental rights, this court reviews the record to determine whether the evidence is clear and convincing. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn.2004). "Termination of parental rights will be affirmed as long as at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the child's best

interests." *Id.* Parental rights should only be terminated for "grave and weighty reasons." *In re Welfare of P.J.K.*, 369 N.W.2d 286, 290 (Minn.1985) (quotation omitted). "Considerable deference is due to the district court's decision because a district court is in a superior position to assess the credibility of witnesses." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 148 (Minn.App.2007) (quotation omitted), *review denied* (Minn. Mar. 28, 2007). Whether to terminate parental rights is discretionary with the district court. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn.2008). The district court's findings of fact will not be overturned unless they are clearly erroneous. *In re Welfare of Child of T.C.M.*, 758 N.W.2d 340, 342 (Minn.App.2008).

## I.

■ A juvenile court may terminate the rights of a parent to a child if it finds

> that a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn.Stat. § 260C.301, subd. 1(b)(4) (2012). The county's burden is "subject to the presumption that a natural parent is a fit and suitable person to be entrusted with the care of his child and that it is ordinarily in the best interest of a child to be in the custody of his natural parent." *In re Welfare of M.H.*, 595 N.W.2d 223, 227 (Minn.App.1999) (quotation omitted). ■ Appellant argues that the record lacks clear and convincing evidence

that he is palpably unfit to parent S.O. Specifically, appellant asserts that his mental handicap alone is not sufficient grounds to terminate his parental rights. We agree. Courts may look to a parent's "actual condition" and not just "conduct" to determine whether a parent is unfit. *P.J.K.*, 369 N.W.2d at 290. But "the mere fact of mental retardation or illness alone is insufficient to show that parental rights should be terminated. Rather, the statute requires that the retardation or illness directly relate to parenting and that it be permanently detrimental to the physical or mental health of the child." *Id.* In other words, "the mental retardation must directly affect the ability to parent." *In re Children of T.R.*, 750 N.W.2d 656, 662 (Minn.2008).

We find no cases affirming the termination of parental rights based solely on a parent's mental impairment. For example, in *In re Welfare of A.V.*, this court affirmed the termination of parental rights of parents who both suffered from low cognitive functioning. 593 N.W.2d 720, 723 (Minn.App.1999), *review denied* (Minn. Aug. 25, 1999). The father suffered an accident that left him with permanent brain damage and an inability to control his anger, resulting in multiple violent episodes and domestic-abuse incidents. *Id.* at 721. The mother suffered from a personality disorder. *Id.* This court concluded that the parents' disabilities were adequately established, and that "both parents simply have no capacity to parent or to engage in constructive efforts to improve their ability to parent." *Id.* at 722. This court emphasized the "inevitable dangers" posed by leaving the children in the care of their parents, one of whom was obviously violent. *Id.; see also P.J.K.*, 369 N.W.2d at 290–91 (affirming TPR where father had permanent mental retardation, was combative, children responded negatively

toward him, he failed to complete his case plan, he could not hold down a job, and he went missing); *S.W.*, 727 N.W.2d at 147–49 (affirming TPR where mother had low cognitive function, mental illness, was uncooperative, had struck her child, and had attempted suicide); *In re Welfare of D.I.*, 413 N.W.2d 560, 565 (Minn.App.1987) (affirming TPR based upon a combination of limited intellectual functioning, mental illness, and chemical dependency).

Unlike the parents in *A.V.*, appellant's disability has not manifested negative behaviors toward his child or others. The testimony regarding appellant consistently stated that appellant was cooperative and had a positive demeanor. Witnesses testified that appellant had a good relationship with his daughter and that this relationship should be maintained. Nevertheless, the county argues that appellant is palpably unfit because his mental impairment "will not improve over time and cannot be treated with medication" and because appellant "struggles to meet his own basi[c] needs, let alone the needs of a toddler." We are not persuaded that a parent's "struggle" to meet his needs is sufficient to support terminating his parental rights.

Moreover, many of the concerns cited by the county and its witnesses relate to conditions that were not present at the time of trial. For example, several witnesses were concerned that appellant was vulnerable to manipulation because he had been exploited in the past. But appellant admitted that he had been taken advantage of in the past by letting friends live with him without paying rent. At the time of trial, appellant and his mother were living together, and there was no testimony that his mother was taking advantage of him. Likewise, another concern was appellant's hygiene and the cleanliness of his home. But since living with his mother, witnesses testified that the cleanliness of appellant's home and his personal hygiene had greatly improved.

In addition, some of the county's concerns are prospective. For instance, the county is concerned that appellant will not be able to keep up with his child's development because of his own intellectual delays. But this remains to be seen and it is speculative. Appellant has had success at learning to better care for himself, manage his finances, and to be a better parent through classes and through county services. Because "the county must prove a consistent pattern of specific conduct or specific conditions existing *at the time of the hearing*," those conditions that appellant has already remedied or that have not yet occurred are not relevant. *T.R.*, 750 N.W.2d at 661 (emphasis added).

The county also argues that appellant would endanger his daughter because he "tends to have poor judgment in an emergency" and he "does not understand what it takes to parent a child." Dr. Frenzel testified that appellant is "at risk for poor judgment under crisis or emergency." But others testified to specific instances where appellant acted appropriately in an emergency. His former employer testified that appellant acted calmly in an emergency situation and that he "doesn't get flustered." He also testified that appellant was good at thinking on his feet with his sandwich-shop customers, and was entrusted with opening and closing two retail stores. Appellant's mother testified that when she had a black-out episode at home, appellant appropriately insisted that she go to the emergency room, and offered to drive her there.

Esser testified that appellant "understands the basic concepts of parenting," but sometimes has difficulty with "abstract problem solving situations." Esser observed appellant changing diapers, practicing good hygiene, and that he "did a really

nice job of playing with [S.O.] and engaging with her." She also testified that appellant is "capable of learning." Likewise, Dr. Frenzel testified that appellant is capable of learning in a "slower way than other people" and that he is "motivated to learn when it comes to parenting." Appellant's ability to learn indicates that any deficiencies he may have as a parent could be remedied. *See T.R.*, 750 N.W.2d at 661 (stating that the county must "prove a consistent pattern of specific conduct or specific conditions ... that appear will *continue for a prolonged, indefinite period*" (emphasis added)).

▇▇▇ The county also emphasizes other deficiencies in appellant's ability to care for himself or others, such as his dependence on financial assistance from the government and his receipt of adult-protection services. But appellant argues that simply because he needs assistance to care for himself or for his child does not mean that he is an unfit parent. We agree. *See, e.g., T.R.*, 750 N.W.2d at 665 (concluding that appellant-father needed chemical-dependency treatment, but was not unfit to parent); *In re Welfare of M.D.O.*, 462 N.W.2d 370, 378 (Minn.1990) (reversing this court and reinstating the district court's dismissal of the TPR petition, concluding that the county failed to provide necessary counseling for parent to enable the parent and child to be reunited). It is significant that appellant has recognized his shortcomings and has obtained the necessary help by utilizing a representative payee, obtaining and maintaining his financial assistance, taking additional classes, and reaching out to his mother for support and guidance. The law encourages the county to provide additional services to parents whose children have been the subject of a TPR petition when the petition is dismissed. *See* Minn.Stat. § 260C.312 (2012) (following the dismissal of a TPR petition, further

county services may be ordered to facilitate reunification with the child). Therefore, appellant's need for services does not require the termination of his parental rights.

▇▇▇ The county argues that terminating appellant's parental rights is in S.O.'s best interest because "it gives the child the best chance for success in the future with her brother and sister with a new family that can provide the type of stability, and safety, that the appellant is ... unable to provide now or in the future." The record demonstrates that S.O. is doing very well in her foster placement. Esser and Jones testified that S.O. has formed a strong bond with her siblings, and that maintaining a relationship with her siblings is in her best interest. But even if maintaining S.O.'s out-of-home placement with her siblings is in her best interest, that is not a sufficient reason to terminate her father's parental rights. The best interest of the child is a "paramount" concern, but termination of parental rights is contingent upon a finding under Minn.Stat. § 260C.301, subd. 1(b), that at least one of the statutory conditions, such as palpable unfitness, is met. Minn.Stat. § 260C.301, subd. 7 (2012); *see also R.W.*, 678 N.W.2d at 54–55 (holding that it was error to base a TPR decision solely on the child's best interest).

## II.

▇▇▇ Appellant also argues that he was never given a meaningful opportunity to parent S.O. because he had few unsupervised visits and no overnight visits. Appellant testified that S.O.'s mother would occasionally let him have S.O. overnight prior to S.O.'s placement in foster care, and that these visits were not conducted with county supervision. In order to terminate a parent's rights to his child, there must be a finding that the county made

reasonable efforts to reunify the parent with the child or that such efforts were unnecessary because they were futile. Minn.Stat. § 260C.301, subd. 8 (2012). The district court made no finding that reasonable efforts were undertaken by the county or that such efforts were unnecessary. Appellant completed his case plan, but the plan only provided for weekly supervised visits. Therefore, the county never provided appellant with a meaningful opportunity to parent S.O. because he could not demonstrate that he could parent her overnight or without supervision. *See T.R.,* 750 N.W.2d at 666 (concluding that county failed to undertake reasonable efforts and that there was a significant disparity between the ample services offered the mother and the few services offered the father whose parental rights were terminated). Because we conclude that the county has not met its burden of proving by clear and convincing evidence that appellant is palpably unfit to parent his child, and because the district court did not find that the county undertook reasonable efforts to reunite appellant with his daughter, we reverse the district court's termination of appellant's parental rights.

## DECISION

We reverse the district court's order terminating appellant's parental rights to S.O. and remand for further proceedings consistent with this opinion and Minn.Stat. § 260C.312.

**Reversed and remanded.**