*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0158**

In the Matter of the Welfare of the Child of: J. S. and M. S., Parents.

**Filed July 14, 2014
Affirmed
Schellhas, Judge**

Waseca County District Court
File No. 81-JV-13-576

Benjamin M. Cass, Smith, Tollefson, Rahrick & Cass, Owatonna, Minnesota (for appellant M.S.)

Paul Dressler, Waseca County Attorney, Rachel V. Cornelius, Assistant County Attorney, Waseca, Minnesota (for respondent Waseca County Department of Human Services)

David R. Borchardt, Owatonna, Minnesota (for respondent J.S.)

Renae Streich, West Concord, Minnesota (guardian ad litem)

        Considered and decided by Connolly, Presiding Judge; Peterson, Judge; and Schellhas, Judge.

# U N P U B L I S H E D   O P I N I O N

**SCHELLHAS**, Judge

        Appellant-father challenges the termination of his parental rights to J.A.S., arguing that the district court abused its discretion by determining that (1) he is palpably unfit to parent J.A.S., (2) the county made reasonable efforts to reunify him with J.A.S., and (3) termination of his parental rights serves the best interests of J.A.S. We affirm.

**FACTS**

J.S. gave birth to J.A.S. on July 11, 2013, and respondent Waseca County Department of Human Services (WCDHS) filed a petition for termination of parental rights (TPR) against J.S. and appellant-father M.S. on July 12. Thereafter, M.S. repeatedly changed his mind about whether he wanted to voluntarily terminate his parental rights to J.A.S. or parent J.A.S. When J.A.S. was born, M.S. expressed interest in voluntarily terminating his parental rights. In August, he communicated that he wanted to parent J.A.S. In October, he communicated that he wanted to voluntarily terminate his parental rights. At a hearing in early November, he communicated that he wanted to parent J.A.S.

The trial on the TPR petition commenced on November 25, 2013, and ended in December. The trial testimony reveals that WCDHS, specifically Child Protection Specialist Ronda Morehead, became involved with J.S. during her pregnancy because of her involuntary transfer of custody or termination of parental rights to a previous child. M.S. concealed from WCDHS the fact that he had voluntarily terminated his parental rights to a child in 2002.

Before the birth of J.A.S., J.S. and M.S. told Morehead that they planned to marry and raise their child. Morehead helped J.S. and M.S. create a plan to overcome the statutory presumption that J.S. is palpably unfit. The plan called for the expectant parents to complete a "Baby Think It Over" doll parenting simulation, chemical-use evaluations, and psychological evaluations. Sue Jewison, a registered nurse who worked for Waseca County Public Health, administered the "Baby Think It Over" doll parenting simulation.

The doll simulates scenarios based on real babies, including feeding and changing diapers. In May 2013, while J.S. and M.S. had possession of the doll for simulation, someone pressed the emergency stop button after less than two hours, before the scheduled end of the simulation. In June, while in possession of a different doll for simulation, the emergency stop button was pressed after about eight hours, before the scheduled end of the simulation. Jewison found nothing mechanically wrong with either doll. Jewison testified that pressing the emergency stop button "has to be purposeful and not accidental" because it requires using a straightened paper clip to press the button.

In June 2013, Barbara Carlson, a licensed professional clinical counselor and licensed drug and alcohol counselor employed by Associated Psychological Services, performed chemical-use and psychological evaluations of M.S. The evaluations revealed that M.S. has an IQ of 80, placing him in the "low average or borderline range of intellectual functioning," and that M.S. "showed characteristics of someone that has dependency needs." In her written evaluation, Carlson explained that a person with dependent traits "may seek relationships in which he can lean on others for security and affection." Based on the evaluations, Carlson recommended that M.S. participate in "therapy to address issues related to dependency, emotional management, self-worth and self-esteem." She also recommended "a program of anger management and/or domestic violence counseling."

Based on the doll-simulation results and the chemical-use and psychological evaluations, Morehead and her supervisor determined that the baby would not be safe in the care of J.S. and M.S. The parents agreed to voluntarily terminate their rights to their

3

child at birth. But, in August, M.S. expressed his desire to parent J.A.S., and Morehead scheduled a parenting evaluation and created a plan on how M.S. could progress. The plan's major goals included M.S.'s attendance in therapy and cessation of residence with J.S. The plan provided M.S. supervised parenting time with J.A.S. four times per week for at least an hour, with two of the four parenting times to include parenting education with Katie Hougas, an in-home family-based services worker at the South Central Human Relations Center. The plan also included extended visits with J.A.S. under the supervision of M.S.'s parents. Carlson completed a parenting evaluation in early September and concluded that M.S. could not successfully parent J.A.S. without making changes that included not living with or dating J.S. and learning how to care for a child. Carlson questioned the sufficiency of M.S.'s progress in learning how to care for a child. In September, by agreement of the parties, the district court extended the timeframe for trial 60 days to allow M.S. additional time to work on his case plan and establish parenting with J.A.S.

M.S.'s mother supervised the first extended visit over a weekend in September and thought the visit went "quite well." But, when confronted with a possible three-to-four-week follow-up visit, she thought about her medical problems and did not think she would be able to supervise the visit. She called M.S. and persuaded him to voluntarily terminate his parental rights.

On October 2, 2013, M.S. left Morehead a voicemail stating he wished to voluntarily terminate his parental rights and not go through with a longer extended visit. Morehead spoke with M.S. and J.S. about their plans. They expressed that they wanted to

decrease parenting time and discontinue parenting education, and M.S. asked whether he needed to attend his first therapy session. Morehead explained that that was M.S.'s decision. On November 4, at a hearing before the district court, M.S. communicated that he wanted to parent J.A.S. and wished to proceed to trial. Morehead and M.S. agreed on a new reunification plan, and M.S. reengaged in services that included therapy, parenting education, and a goal to live separately from J.S.

Both M.S. and his mother concealed from Morehead that M.S. voluntarily terminated his parental rights to a previous child in October 2002. M.S. testified that, when asked whether he had any other children, he said no because he did not think it mattered. His mother testified that she did not disclose M.S.'s other child because she did not think the child "was pertinent."

Many witnesses discussed M.S.'s overall progress toward being able to parent J.A.S. Morehead noted that M.S.'s IQ was not low enough to get special treatment in parenting education and that the extended visit was no longer available to M.S. due to his mother's health concerns that led to multiple surgeries. Morehead supervised multiple visits between July and November 2013 and noted that M.S. had trouble picking up on J.A.S.'s cues. For example, M.S. continued to cradle J.A.S. even though J.A.S. clearly did not enjoy this position. Morehead suggested multiple times to M.S. that he adjust his behavior, but M.S. repeated the same behavior. Morehead expressed concern about M.S.'s failure to follow the plan recommendations, as demonstrated by his frequent changes of heart about parenting J.A.S., his failure to live independently from J.S., and

his lack of participation in therapy. Morehead opined that termination of M.S.'s parental rights is in J.A.S.'s best interests.

Katie Hougas restarted M.S.'s parenting education after the November 4 hearing at which M.S. communicated that he had changed his mind and wanted to parent J.A.S. Initially, M.S. wanted to learn developmental skills about raising a newborn, but he learned very slowly and failed to apply the skills Hougas taught him. That failure continued into December. Specifically, M.S. responded poorly to J.A.S.'s cues and moved J.A.S. frequently, upsetting him. Hougas opined that M.S. would not be able to parent in the reasonably foreseeable future and that J.A.S.'s best interests are served by M.S. no longer trying to parent him.

Elishua Crocker, an intern at WCDHS, supervised some of M.S.'s parenting time with J.A.S. Crocker noted that M.S. frequently moved J.A.S., did not pick up on J.A.S.'s cues, and did not improve in his more recent visits. Crocker opined that adoption is in J.A.S.'s best interests.

J.S.'s mother supervised some of M.S.'s parenting time with J.A.S. She noticed that M.S. was "really antsy and irritated" when J.A.S. became "a little crabby," and she did "not really" see any improvement in his parenting skills between September and November. M.S.'s brother testified that M.S. has never lived independently and has minimal work history. M.S. was involved in raising his previous child, but his brother opined that M.S. cannot parent and that M.S.'s decision to terminate his parental rights was the "best adult decision [M.S.] ever made." M.S. testified that he was living with his parents, had applied for a few jobs without success, and had attended therapy for the first

6

time on December 4. His "first request" was to have custody of J.A.S., but he was also "comfortable" with "a child protection petition instead."

J.A.S.'s court-appointed guardian ad litem (GAL) did not testify during the trial but provided brief recommendations following closing arguments. The GAL stated that J.A.S.'s best interests are not served by delaying his permanency or changing his current placement.

The district court accepted J.S.'s voluntary TPR, determined that the provision of further services to M.S. would be futile, found M.S. to be palpably unfit to parent J.A.S., found that TPR of both parents is in J.A.S.'s best interests, and terminated the parental rights of J.S. and M.S. to J.A.S.

This appeal by M.S. follows.

**D E C I S I O N**

Appellate courts "review the termination of parental rights to determine whether the district court's findings address the statutory criteria and whether the district court's findings are supported by substantial evidence and are not clearly erroneous." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). "[W]hen determining whether a finding of fact is clearly erroneous, [appellate courts] view the evidence in the light most favorable to the verdict." *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013). "[T]he district court is required to 'make findings and conclusions as to the provision of reasonable efforts' or must find that the provision of services or additional services would be futile." *In re Children of T.A.A.*, 702 N.W.2d 703, 709 (Minn. 2005) (quoting Minn. Stat. § 260.012(c) (2004), which is now Minn.

7

Stat. § 260.012(h) (2012)). "Considerable deference is due to the district court's decision [to terminate parental rights] because a district court is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996). Appellate courts will affirm a TPR if "at least one statutory ground alleged in the petition is supported by clear and convincing evidence and termination of parental rights is in the child's best interests." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008). When "reviewing a district court's decision regarding whether a particular statutory basis for involuntarily terminating parental rights is present," appellate courts review "findings of the underlying or basic facts for clear error," and review the district court's "determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 899, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

***Palpable Unfitness***

The district court concluded that M.S. is palpably unfit to parent J.A.S. under Minnesota Statutes section 260C.301, subdivision 1(b)(4) (2012), which provides that the juvenile court may terminate parental rights when it finds

> that a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

8

The district court's conclusion is supported by numerous, detailed findings that summarize the trial testimony. Despite the denials of J.S. and M.S., the court found that no reason existed to believe that the doll-simulation trials failed because of any persons other than J.S. and M.S. or failure of the dolls. M.S. showed no improvement in parenting skills between September 2013 and December 2013, even though M.S. received parenting education from Hougas. The court expressed concern about the fact that M.S. was "focused primarily on questions regarding child development" during his time with Hougas, despite having been "a fulltime parent for several years" in regard to his other child before his voluntary termination of parental rights. The court found that if M.S. attempted to parent J.A.S. alone, he would soon turn to J.S. or his mother to actually provide the day-to-day parenting of J.A.S. The district court agreed with the professionals and M.S.'s brother, who testified that M.S. does not have the capability to raise a child of J.A.S.'s age, now or in the reasonable future. The court found that M.S. "failed to take advantage of services and opportunities provided to him by WCDHS to ensure the safety and well-being of [J.A.S.]."

M.S. correctly notes that Carlson's psychological testing did not indicate that he cannot parent. But Carlson opined that M.S. needed to make certain changes in order to successfully parent J.A.S. and questioned whether M.S. was making enough of an effort or showing enough progress to learn how to care for a child.

M.S. argues that the district court excessively relied on his history. We disagree. The district court found that M.S. is unable to appropriately care for J.A.S.; M.S. likely would turn to J.S., who was previously found to be palpably unfit to parent, or his mother

9

to provide J.A.S.'s day-to-day care; and M.S.'s mother would be unable to care for J.A.S. "When considering termination of parental rights, the court relies not primarily on past history, but to a great extent upon the projected permanency of the parent's inability to care for his or her child." *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996) (quotations omitted). M.S. challenges the district court's finding that his mother could not temporarily provide a home for M.S. to raise J.A.S. But Morehead testified that his mother's health problems prevented future supervised visits. Although his mother testified at the trial that she was willing to supervise M.S.'s parenting of J.A.S., she acknowledged that she previously believed that her health interfered with supervising M.S.'s visits with J.A.S. The district court's finding is not clearly erroneous. We conclude that the district court appropriately focused on the projected permanency of M.S.'s inability to care for J.A.S.

Citing a recent decision of this court, M.S. correctly notes that "simply needing assistance to care for himself and J.A.S. does not mean M.S. is unfit." *See In re Welfare of Children of B.M.*, 845 N.W.2d 558, 565 (Minn. App. 2014) (agreeing with B.M. that "simply because he needs assistance to care for himself or for his child does not mean that he is an unfit parent"); *cf. T.R.*, 750 N.W.2d at 662 ("[M]ental retardation alone does not render a parent palpably unfit. Rather, the mental retardation must directly affect the ability to parent." (citation omitted)). But we disagree with M.S. that *B.M.* requires reversal in this case because the facts in *B.M.* are easily distinguishable from the facts in this case. First, B.M. lived with his mother without any problems. *B.M.*, 845 N.W.2d at 564. Second, in *B.M.*, a licensed psychologist performed a parenting assessment for B.M.

and his mother and testified that "[B.M.] together with [his mother] could co-parent effectively." *Id.* at 561. Third, the psychologist testified that "[B.M.] is capable of learning in a 'slower way than other people' and that he is 'motivated to learn when it comes to parenting.'" *Id.* at 565. Fourth, a county caseworker testified that "[B.M.] 'understands the basic concepts of parenting' . . . and . . . 'did a really nice job of playing with [his child] and engaging with her.'" *Id.* at 564−65. Fifth, B.M. "recognized his shortcomings and . . . obtained the necessary help." *Id.* at 565. This court noted that "[B.M.]'s ability to learn indicates that any deficiencies he may have as a parent could be remedied." *Id.* Sixth, B.M.'s child was approximately age two at the time of trial. *Id.* at 560–61. Seventh, B.M.'s former employer testified that B.M. "acted calmly in an emergency situation," "was good at thinking on his feet with his sandwich-shop customers, and was entrusted with opening and closing two retail stores." *Id.* at 564.

In this case, at the time of trial, M.S. remained unemployed, had scant history of employment, and was unable to maintain the employment that his brother secured for him at his brother's place of employment. M.S. was living temporarily with his parents and the district court deemed the idea that M.S.'s mother could provide a healthy and sustainable living situation for J.A.S. to be "not realistic." The district court found that M.S. "has never lived by himself and there is no foreseeable likelihood he will be able to arrange independent housing any time soon." M.S. struggles with parenting basics and repeatedly ceased seeking help necessary to improve his parenting skills.

M.S. argues that he is capable of parenting J.A.S. because he showed progress in parenting skills, "his improvements clearly reflect an ability to change," he found housing

away from J.S., his delay in starting therapy was not unrealistic, and he attempted to find employment. We note that, at the time of trial, M.S. was generally case-plan compliant, had ceased living with J.S., and was attending parenting education and therapy. But, despite M.S.'s changes and areas of improvement at the time of trial, he still did not pick up on J.A.S.'s cues without consistent prompting or appropriately speak to J.A.S. M.S. lived away from J.S. only since sometime after November 25, 2013, and his living situation with his parents was only temporary. At the time of trial, M.S. had never lived alone, with or without having the responsibility of caring for an infant. And M.S. had only begun therapy in December. The law did not require the district court to rely on progress made a few weeks before the termination trial. *See In re Welfare of J.L.L.*, 396 N.W.2d 647, 651, 653 (Minn. App. 1986) (concluding that "minimal" recent progress "a few weeks before the termination [trial]" was insufficient to avoid termination); *In re Welfare of Maas*, 355 N.W.2d 480, 483 (Minn. App. 1984) (noting that "appellant had made some improvement in the . . . month" preceding the hearing but affirming the trial court's termination of appellant's parental rights).

We agree with M.S. that his revocation of consent to voluntary termination has no *procedural* significance before a court accepts the consent and orders termination. *See In re Welfare of Child of J.L.L.*, 801 N.W.2d 405, 410 (Minn. App. 2011) ("[A] parent is not precluded from revoking a voluntary consent to termination for any reason before the court has accepted the consent and ordered termination." (quotation omitted)), *review denied* (Minn. July 28, 2011). But a court is not precluded from attaching *substantive* significance to M.S.'s repeated changes in his position regarding whether he wished to

voluntarily terminate his parental rights or attempt to parent J.A.S. We conclude that the district court's determination that M.S. is palpably unfit to parent J.A.S. is based on numerous findings of fact that are based on substantial evidence and are not clearly erroneous.

### *Reasonable Efforts to Reunite*

The district court must make specific findings that the county made reasonable efforts to reunify the parent with the child, Minn. Stat. § 260C.301, subd. 8 (2012), or, "[i]n the alternative, the court may determine that provision of services or further services for the purpose of rehabilitation is futile and therefore unreasonable under the circumstances," Minn. Stat. § 260.012(h). When determining whether reasonable efforts were made, the court must consider whether the services are "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h). "[T]he nature of the services which constitute reasonable efforts depends on the problem presented." *T.R.*, 750 N.W.2d at 664 (quotation omitted).

The district court detailed in its findings of fact the reunification services afforded to M.S., his participation in the services, and his progress or lack thereof. The court also found that "[a]bout six weeks were lost between the time [M.S.] advised . . . Morehead that he wanted to voluntarily terminate his parental rights and the time that he advised . . . Morehead that he had changed his mind and he wanted to go to trial." The

13

court found that "[M.S.]'s intentions to raise [J.A.S.] have changed several times and there is no reason to believe that he will not change his mind again."

M.S. argues that the services provided did not take into account his low IQ or give him a sufficient opportunity to prove he could progress. But the record reveals that the professionals did take into consideration M.S.'s IQ, which the district court notes in its findings. Morehead testified that M.S.'s IQ meant "there's nothing developmentally disabled" about him and that "he would not qualify for any additional services based on that information." Hougas testified that she noticed that M.S. learned slowly and that she encouraged him multiple times per visit to do certain tasks. Indeed, the district court extended the trial timeframe 60 days to allow M.S. additional time to utilize the reunification services afforded to him. Multiple parties testified that, despite this encouragement and additional time, M.S. made insufficient progress.

M.S. argues that WCDHS failed to attempt to reengage services after M.S. voluntarily stopped services. Based on his decision to voluntarily terminate his parental rights, M.S. did not engage in services between October 2, 2013, and November 4, 2013. During that time, WCDHS was not responsible to actively solicit M.S.'s reengagement in his case plan. "[R]easonable efforts, by definition, do[] not include efforts that would be futile." *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 56 (Minn. 2004) (quotation omitted).

In its November 8, 2013 order, the district court found that WCDHS had made "reasonable efforts to avoid placement and to achieve permanency." Regarding the court's TPR order, M.S. argues that the "conclusions of law do not specifically address

14

the provision of reasonable efforts and it is required to evaluate those efforts." M.S. is correct that the court did not expressly find reasonable efforts had been made, but the court found that the "[p]rovision of services or further services for the purpose of reunification would be futile and unreasonable." *See* Minn. Stat. § 260.012(h) ("In the alternative, the court may determine that provision of services or further services for the purpose of rehabilitation is futile and therefore unreasonable under the circumstances."); *T.A.A.*, 702 N.W.2d at 709 ("[T]he district court is required to 'make findings and conclusions as to the provision of reasonable efforts' or must find that the provision of services or additional services would be futile." (quoting Minn. Stat. § 260.012(c) (2004), which is now Minn. Stat. § 260.012(h) (2012))); *S.Z.*, 547 N.W.2d at 892 ("In some cases, any provision of services or further provision of services would be futile, and therefore unreasonable."). Viewing the district court's finding of futility along with its detailed findings that summarize WCDHS's substantial efforts to address M.S.'s parenting needs and reunify him with J.A.S., the findings amply reveal the district court's consideration of WCDHS's reunification efforts and the correctness of its determination that, under the circumstances in this case, future reasonable efforts would be futile. We conclude that the district court's finding of futility is authorized under Minn. Stat. § 260.012(h) and is amply supported by evidence in the record.

### Best Interests

The child's best interests are "the paramount consideration in every termination case." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990); *see* Minn. Stat.

§ 260C.301, subd. 7 (2012) ("In any proceeding under this section, the best interests of the child must be the paramount consideration.").

> Before ordering termination of parental rights, the court shall make a specific finding that termination is in the best interests of the child and shall analyze:
> (i) the child's interests in preserving the parent-child relationship;
> (ii) the parent's interests in preserving the parent-child relationship; and
> (iii) any competing interests of the child.

Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3). The district court "must balance the preservation of the parent-child relationship against any competing interests of the child." *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 668 (Minn. App. 2012). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *Id.* (quotation omitted). "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7; *see J.R.B.*, 805 N.W.2d at 902 (noting that conflicts between the rights of the child and the rights of the parent are resolved in favor of the child). "We review a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *J.R.B.*, 805 N.W.2d at 905.

Here, the district court determined that termination of M.S.'s parental rights serves J.A.S.'s best interests, explaining that M.S.

> failed to take advantage of services and opportunities provided to him by WCDHS to ensure the safety and well-being of [J.A.S.]. The Court finds that [J.A.S.]'s interest in emotional and psychological stability, a stable environment, and overall safety and well-being is paramount and takes precedence over any competing interests of [M.S.] to preserve

16

the child-parent relationship. The best interests of [J.A.S.] is served by the termination of [M.S.]'s parental rights because the Commissioner of the Minnesota Department of Human Services can and will provide appropriate permanency planning for the child pending the adoption of [J.A.S.].

The district court did not abuse its discretion by determining that termination of M.S.'s parental rights is in J.A.S.'s best interests.

**Affirmed.**