*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1262**

In re the Matter of:
Matthew J. Covington,
Respondent,

vs.

Alyssa Eckstrom,
Appellant,

and

Eileen Eckstrom, Third Party Intervenor,

Dale Covington, et al., third party intervenors,
Respondents.

**Filed June 22, 2015
Affirmed; motion denied
Ross, Judge**

Ramsey County District Court
File Nos. 62-FA-13-1004
62-F8-07-050104

Matthew J. Covington, Tampa, Florida (pro se respondent)

Michael P. Boulette, Lindquist & Vennum, LLP, Minneapolis, Minnesota; and

Becky Owen, Binder Law Office, P.A., Minneapolis, Minnesota (for appellant)

Eileen Eckstrom, Roseville, Minnesota (pro se third party intervenor)

Jillian K. Duffy, Kimberly J. Robinson, Robinson Duffy, P.L.L.C., Minneapolis, Minnesota; and

Erik F. Hansen, Burns & Hansen, P.A., Minneapolis, Minnesota (for third party intervenors, respondents, Dale and Linda Covington)

Barnett I. Rosenfield, Pamela S. Hoopes, Mid-Minnesota Legal Aid, Minnesota Disability Law Center, Minneapolis, Minnesota; and

Liselotte D. Kaiser, Jean Lastine, Central Minnesota Legal Services, Minneapolis, Minnesota (for amicus curiae)

Linda Gerr, St. Paul, Minnesota (Guardian ad Litem)

Considered and decided by Reilly, Presiding Judge; Ross, Judge; and Kirk, Judge.

## UNPUBLISHED OPINION

**ROSS**, Judge

In this custody dispute over eight-year-old N.B., the district court's custody order granted sole legal and physical custody to paternal grandparents Dale and Linda Covington and parenting time to mother Alyssa Eckstrom. Eckstrom argues on appeal that clear and convincing evidence does not support the district court's finding that the reasons for placing N.B. in the Covingtons' primary care override N.B.'s interest in a day-to-day relationship with Eckstrom as her mother. She also argues that the district court should have treated the Covingtons' petition as a motion to modify custody, should have given greater weight to particular facts, and should have assigned Eckstrom at least 25% parenting time. Because the evidence supports the district court's finding that the child faces physical and emotional danger in her mother's care and because Eckstrom's other arguments do not support reversal, we affirm.

2

## FACTS

Alyssa Eckstrom gave birth to N.B. in 2006. Eckstrom has been diagnosed with severe cognitive disabilities, including mental retardation, with test scores indicating that her intelligence quotient is lower than all but 1% of her age group. She did not immediately become an independent adult at age 18; her mother formally continued to be her guardian when Eckstrom reached adulthood. The probate court in the guardianship proceedings found that Eckstrom "[l]acks sufficient understanding or capacity to make or communicate responsible decisions concerning her person" and that she has an "inability to meet her [own] needs for medical care, nutrition, clothing, safety, or shelter." Eckstrom continued living with her mother under her guardianship until 2010.

N.B. also has special needs. From birth she has endured an auditory neuropathic condition that resulted in sensorineural hearing loss. N.B. uses cochlear implants. Even with the implants N.B. has receptive and expressive language delays.

N.B.'s father, Matthew Covington, is not substantially part of this custody dispute. The district court had granted him sole legal and physical custody of N.B. because of Eckstrom's disabilities, but Matthew left the child in his parents' care and left the state in 2012. Matthew's parents, Dale and Linda Covington, began primarily caring for N.B. then. Even before Matthew left, the district court in 2009 had granted Eckstrom parenting time only when she was in the presence of a mature adult approved by Matthew's parents.

Only days after the district court put N.B. primarily in the care of the Covingtons in 2009, Eckstrom gave birth to her second daughter, K.C. K.C., like her older sister, has

3

special needs. Eckstrom successfully petitioned to be restored to capacity the following year, and she began living independently of her mother, albeit dependent on government assistance.

The Covingtons moved to Cannon Falls in October 2010. The move facilitated N.B.'s medical treatment at the Mayo Clinic, and the Covingtons helped her obtain cochlear implants. The 2010 move increased the distance between N.B. and Eckstrom, who lived in Roseville and who lacked a driver's license. Eckstrom rarely saw N.B.

Eckstrom's mother, Eileen, intervened in the custody litigation in 2012. Before Matthew left town, the district court entered an order in February 2012 based on a stipulation between Matthew, Eckstrom, and Eckstrom's mother, granting Eckstrom unsupervised parenting time. Adopting a later stipulation between the same parties, the district court entered an order in March 2013 granting Eckstrom and Matthew joint legal and physical custody of N.B. and placing N.B. with Eckstrom. This was despite the fact that Matthew had already moved away, and the Covingtons, who had been N.B.'s primary caregivers, were not provided any notice about the agreement and order. The Covingtons learned of it only when police arrived to their home with Eckstrom to remove N.B. from them immediately. The move prevented N.B. from finishing the school year in Cannon Falls.

The Covingtons immediately petitioned for third-party custody. The district court appointed a guardian ad litem for N.B., required Eckstrom to be assessed for her "adaptive functioning," and ordered her and the Covingtons to undergo parenting

4

assessments. The guardian ad litem and two evaluators submitted reports to the district court. A referee held a two-day evidentiary hearing in April and May 2014.

The district court, through the referee, made its custody decision after finding that evidence provided by a psychologist and N.B.'s guardian ad litem proved "by clear and convincing evidence that placing the minor child with the Covingtons takes priority over preserving the day to day parent child relationship between [Eckstrom] and the minor child because of the presence of physical or emotional endangerment to the minor child." The court also made a finding that "due to [Eckstrom's] developmental difficulties, [she] is unable to provide appropriate care and protection for the minor child." The district court then found by a preponderance of the evidence that it is in N.B.'s best interests to be in the Covingtons' custody. It ordered the Covingtons immediately to serve as N.B.'s sole legal and physical custodians, subject to Eckstrom's parenting time.

Eckstrom appeals.

## D E C I S I O N

Eckstrom offers four reasons to reverse the district court's custody decision. She argues that the Covingtons did not prove that N.B. was subject to physical or emotional danger in her care. She argues that the district court failed to make findings required by the third-party custody statute. She argues the district court misapplied the law by failing to require the Covingtons to meet the statutory requirements for modification of a prior custody order. And she argues that the district court failed to apply the statutory presumption that she is entitled to at least 25% parenting time.

# I

We first address Eckstrom's argument that the Covingtons did not prove that N.B. was subject to physical or emotional danger in her care. The Covingtons petitioned for custody of N.B. as interested third parties under Minnesota Statutes section 257C.03. That statute authorizes the district court to order third-party custody despite the weighty presumptive parental right to custody if placing the child with the petitioning nonparent will avoid "the presence of physical or emotional danger to the child." Minn. Stat. § 257C.03, subd. 7(a)(1)(ii) (2014). We review for an abuse of discretion the district court's finding that N.B. is endangered in Eckstrom's care. *See Lewis-Miller v. Ross*, 710 N.W.2d 565, 568 (Minn. 2006).

The district court reached its conclusion that N.B. is endangered in Eckstrom's care by weighing the evidence that supports the conclusion against the competing evidence. All of the evidence for and against the decision was largely undisputed.

The evidence that tends to indicate endangerment is the expert testimony and reports and the Covingtons' testimony. Psychologist Mary Maguire conducted Eckstrom's parenting assessment and indicated that Eckstrom's greatest parenting challenges are her cognitive limitations, social immaturity, and lack of judgment. Maguire testified that Eckstrom neither understood N.B.'s developmental disabilities nor interacted with her in a developmentally appropriate manner. For example, Maguire observed that Eckstrom used baby talk with N.B. even though N.B. was seven years old. She reported that Eckstrom's disabilities and N.B.'s communicative difficulties aggravate Ecksrom's inability to understand N.B.'s needs. Maguire opined that, although education

6

and support might improve Eckstrom's parenting, Eckstrom was not receiving any support and was not coordinating support services with N.B.'s school. Maguire also observed that Eckstrom struggles to meet her own needs, exacerbating her apparent inability to appreciate and meet the child's special needs.

Maguire highlighted Eckstrom's anxiety and "the level of chaos in [Eckstrom's] life," which included "almost constant reports from her of conflict, harassment and . . . personal attacks." Maguire gave an example—an event at her office in which "four police cars, two fire trucks, and the bomb squad" responded to a questionable report that someone had followed Eckstrom and her companion to the appointment. The police found the report unsubstantiated. She concluded, "[I]t is unlikely [Eckstrom] will be able to increase her social functioning to the level needed to adequately parent her daughter full-time. And this is likely to become more challenging as [N.B.] becomes older."

N.B.'s guardian ad litem, Linda Gerr, similarly reported that Eckstrom's developmental delays would prevent her from parenting N.B. appropriately. Gerr did not believe that Eckstrom was providing her other daughter, K.C., the intensive treatment that K.C. needed, and she anticipated the same result for N.B. if N.B. remained in Eckstrom's care. Her observations led her to conclude that Eckstrom could not likely maintain "a consistent, stable home and parenting without her mother and attorney assisting her," and she highlighted the unstable and occasionally acrimonious relationship between Eckstrom and her mother, making continuous assistance from her unlikely. Gerr was also troubled by Eckstrom's poor judgment, and she cited two examples: Eckstrom's decision to suddenly remove N.B. from the Covingtons' home without any notice and without

allowing N.B. to finish the year where she had been attending school, and Eckstrom's allowing individuals with criminal records to be around and alone with N.B.

Dr. Jonathan Hoistad testified as Eckstrom's expert witness, but his testimony did not favor Eckstrom. He testified that Eckstrom could not function or adequately care for N.B. independently. He observed that Eckstrom needs help in transportation, reading and understanding materials, and coordinating services. Dr. Hoistad opined that Eckstrom is unlikely to increase her abilities sufficiently to parent N.B.

The Covingtons likewise testified that Eckstrom was not meeting N.B.'s special needs. They testified that Eckstrom had failed to ensure that N.B. used her hearing aids. And N.B. had recently returned from time with Eckstrom with an external piece of her cochlear implant broken. Linda Covington testified that after two weeks in Eckstrom's care, N.B. was generally thin and dirty and neither her fingernails nor toenails were cut. The difficulty is that N.B.'s own delays make her dependent on adults for her personal care. Dale Covington also testified that when N.B. returned from time with Eckstrom, N.B. has been upset and bruised.

The fact that tends to argue against the endangerment determination is N.B.'s progress despite Eckstrom's parental deficiencies. Most notably, during the 13 months that N.B. was with Eckstrom, the evidence indicated that N.B. attended Northern Voices, a school for children with hearing disabilities, and she made significant progress in her communication skills there. And the district court also recognized that Eckstrom has a close relationship with N.B.

The district court weighed all of this evidence, and it found that Eckstrom needs help to function independently and parent, but she receives help only from her mother. The district court found that Eckstrom's mother actually has a negative effect on Eckstrom. (And the court called Eckstrom's mother's courtroom behavior, including her comments and gestures, "deplorable.") It found that Eckstrom is unable to provide N.B. with a stable, satisfactory environment, and it seriously questioned Eckstrom's ability to give guidance and make safe decisions. It found that Eckstrom's developmental difficulties prevented her from providing "appropriate care and protection for" N.B. And it concluded that clear and convincing evidence showed the presence of physical or emotional endangerment that made placing N.B. with the Covingtons a higher priority than preserving N.B.'s day-to-day relationship with Eckstrom.

Although the evidence of endangerment is not overwhelming, we are satisfied that the district court did not abuse its discretion by determining that the Covingtons proved by clear and convincing evidence that N.B. faces physical or emotional endangerment in Eckstrom's care. The statute requires the presence of danger, not evidence that a child has already been harmed. *See* Minn. Stat. § 257C.03, subd. 7(a)(1)(ii). Eckstrom's low cognitive capacity and her disabilities, coupled with N.B.'s own special needs, create parenting challenges that, according to all the testifying experts (including Eckstrom's), Eckstrom cannot handle without help. Eckstrom has not sought help from social services, and at least one expert did not see Eckstrom's mother as the proper and reliable source for the continued assistance Eckstrom needed to care for N.B. The record also indicates that Eckstrom does not consistently meet the special needs of her other child. It suggests

9

that Eckstrom would lack the skills necessary to meet even a typical child's ordinary but essential needs, and it demonstrates emphatically that she lacks the extraordinary parenting skills and judgment necessary to meet the serious and ongoing needs of two special-needs children. This supports the district court's conclusion that the child faces genuine physical or emotional risks if left in Eckstrom's primary care.

Neither the supreme court's holdings in *In re Children of T.R.*, 750 N.W.2d 656 (Minn. 2008), and *In re Welfare of P.J.K.*, 369 N.W.2d 286 (Minn. 1985), nor our holding in *In re Welfare of Children of B.M.*, 845 N.W.2d 558 (Minn. App. 2014), require a different conclusion. Those cases stand for the proposition that a parent's low cognitive functioning or mental illness is relevant to terminating parental rights only if the condition relates to parenting and is detrimental to the child's health. *T.R.*, 750 N.W.2d at 662; *P.J.K.*, 369 N.W.2d at 290; *B.M.*, 845 N.W.2d at 565. And in *B.M.* we held that a parent's need for assistance to care for herself or to care for her child does not alone make her unfit to parent. 845 N.W.2d at 565. Those termination cases do not control here, where the district court decided only custody; it did not terminate Eckstrom's parental rights, permanently and absolutely destroying the legal relationship between parent and child. And to the extent that these cases can inform a custody decision, the district court did not offend their reasoning. It analyzed Eckstrom's intellectual and developmental limitations only as they affected her parenting of N.B., and it observed that Eckstrom in fact lacks the support necessary for her to parent adequately.

We also address a procedural issue. Eckstrom has moved to strike several exhibits that the Covingtons included in their appellate submission but that the trial transcript does not reflect were ever admitted into evidence. Most of the disputed exhibits are irrelevant, and so, as to them, the motion is moot. The only relevant exhibit that Eckstrom seeks to exclude is Exhibit X, a psychological assessment of N.B. by Dr. Nanette McDevitt. Both sides identified this document in their respective exhibit lists at trial, and both referred to its contents in detail at the evidentiary hearing as if it were admitted into evidence. In fact, Eckstrom's trial counsel specifically asked a witness to consider evidence in Exhibit X. We cannot base our decision on evidence not received by the district court. *Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn. 1988). But the parties each treated this exhibit at trial as if it had been admitted, without objection by the other party. (And it may indeed have been accepted without properly including the acceptance on the record, as the Covingtons assert that their attorney and Eckstrom's trial counsel agreed in chambers to admit this document along with many others.) If a party disagrees about "whether the record truly discloses what occurred in the trial court," she must submit her difference to the trial court for that court to decide the matter and correct the record accordingly. Minn. R. Civ. App. P. 110.05. Because there is no record that Eckstrom moved the district court to correct its implied acceptance of Exhibit X, we deny Eckstrom's motion as to that exhibit. We also observe that we nevertheless have not placed great emphasis on that exhibit in our decision.

We are mindful that a very strong presumption favors custody with a parent in a contest between a parent and a grandparent. The district court took substantial care to

11

honor that presumption. We hold that it did not abuse its discretion by concluding that the child would be endangered emotionally or physically in Eckstrom's care under current and foreseeable future conditions.

## II

Eckstrom argues that the district court abused its discretion by failing to make particularized findings that she says are required by statute. The third-party custody statute directs the district court to "consider" eight factors. Minn. Stat. § 257C.03, subd. 7(b) (2014). But the statute does not require that the court enter express findings on any of the factors. *See id.* And to the extent that the factors are relevant, the order reflects that the district court did consider them. Eckstrom focuses on subdivision 7(b)(5), which requires the district court to consider "the parent's refusal to comply with conditions for retaining custody set forth in previous court orders." *Id.*, subd. 7(b)(5). Eckstrom argues that the court should have assigned conditions and given her a chance to comply with them before granting custody to the Covingtons. The statute plainly refers to compliance with "previous" orders, and it does not require the district court to create a new order and require compliance before determining custody. *See id.* She also contends that the court should have considered N.B.'s relationship with her half-sister, K.C., who was in Eckstrom's care. The provision Eckstrom directs us to apply is inapplicable on its express terms because K.C. is not in the Covingtons' care. *See id.*, subd. 7(b)(7). We observe, however, that an uncited provision, subdivision 7(c), does require the district court to apply the best-interest factors of section 257C.04, and these factors include "the interaction and interrelationship of the child with . . . siblings." Minn. Stat. § 257C.04,

12

subd. (1)(a)(5) (2014). Although the district court did not expressly consider N.B.'s relationship with K.C. in its best-interest assessment, its findings indicate that it did give considerable attention to K.C. The findings recount the guardian ad litem's report that, based on K.C.'s medical and scholastic records, Eckstrom had failed to provide for any of that child's special needs and that this evidences Eckstrom's inability to also provide for N.B.'s special needs. Eckstrom does not indicate, and the record does not allow us to suppose, that a specific finding on the close relationship between the two girls would have affected the district court's best-interest findings in light of N.B.'s endangerment (and possibly K.C.'s endangerment) in Eckstrom's custody. Despite the omission, the evidence presented about K.C. supports the district court's conclusion far more than it opposes it.

### III

Eckstrom argues to us, as she argued to the district court, that Minnesota Statutes section 518.18 applies and required the Covingtons to show a change in circumstances before the district court could modify custody. The district court did not expressly answer whether section 518.18 applies. We review de novo the statutory-construction question of whether section 518.18 applies to initial interested-third-party proceedings brought under section 257C.03. *See Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 393 (Minn. 1998) (applying de novo review to questions of statutory interpretation).

The statute establishes plainly that section 518.18 "govern[s] *modification* of an order under [chapter 257C]." Minn. Stat. § 257C.06 (2014) (emphasis added). Section 518.18's procedures therefore unquestionably govern a third party's attempt to modify

her *prior* third-party-custody order. But the statute does not indicate that courts must apply the high modification standard of proof to an *initial* interested-third-party petition for custody. Under section 518.18, a court may modify a prior custody order that specifies a child's primary residence only if a change has occurred in the child's or the parties' circumstances and the modification is necessary to serve the child's best interests. Minn. Stat. § 518.18(d) (2014). The legislature set out comprehensive procedures for commencement of initial interested-third-party proceedings, and those procedures, codified in section 257C.03, do not refer to section 518.18.

The statutes do not reflect any legislative intent to overlay the requirements specifically addressing these initial proceedings with section 518.18's standard for modification. That the legislature expressly incorporated section 518.18's provisions for the "modification" of orders issued under 257C but did not similarly incorporate section 518.18 as to initial petitions under 257C is in keeping with the reality that, in many cases, a child for whom third-party custody is sought is already the subject of a custody order or arrangement. If a third-party's initial custody petition were treated as a modification in every case, the district court might be precluded from considering the evidence that establishes the child's relevant current circumstances.

And parts of section 518.18 are incongruous with initial third-party-custody proceedings. For example, newly initiated third-party proceedings allow for third-party custody based not only on clear, specified reasons but also broadly because of "other extraordinary circumstances." Minn. Stat. § 257C.03, subd.7(a)(iii). It appears that the broadest statutory reason for initial third-party custody in subpart iii is not available for

14

modification under section 518.18, indicating that the legislature intended different standards to apply to the different proceedings. It also seems unlikely to us that the legislature intended to require third-party petitioners who, like the Covingtons, were never party to the parental custody proceedings, to show a change in circumstances when their absence from the prior proceedings prevented them from developing the factual record of the circumstances.

In sum, section 518.18's procedures for modification of a custody order assume that the parties were previously involved with custody litigation. The district court properly recognized that the modification procedures are not the starting point for the Covingtons' third-party custody petition.

**IV**

Eckstrom argues that the district court erred by not applying the statutory presumption that Eckstrom would be afforded at least 25% of the parenting time for N.B. "In the absence of other evidence, there is a rebuttable presumption that a parent is entitled to receive at least 25 percent of the parenting time for the child." Minn. Stat. § 518.175, subd. 1(g) (2014). Eckstrom was awarded parenting time on alternating weekends and alternating holidays, affording her only about 14% of N.B.'s time. The district court's endangerment finding, which we have held to be sufficiently supported by the evidence, likely would resolve the issue. But the presumption is not self-effecting. We have said that the district court must "demonstrate an awareness and application of the 25% presumption *when the issue is appropriately raised* and the court awards less than 25% parenting time." *Hagen v. Schirmers*, 783 N.W.2d 212, 217 (Minn. App. 2010)

(emphasis added). Eckstrom never raised the issue before the district court. Because Eckstrom waived the argument, we do not consider it. *Id.* at 219 n.4 (citing *Thiele*, 425 N.W.2d at 582).

**V**

We have also heard from *amici curiae*, Mid-Minnesota Legal Aid, Minnesota Disability Law Center, and Central Minnesota Legal Services. They argue that Minnesota custody law does not comply with federal law, that the district court engaged in discriminatory bias prohibited by the Americans with Disabilities Act, that the district court violated that act by not providing parenting assistance, and that third parties seeking custody must be required to prove that the state engaged in reasonable efforts that failed to correct conditions that would justify termination of parental rights. These arguments do not seem convincing; they rely in part on a misconstruction of federal or state laws, and they rely in part on examples of egregious but irrelevant mistreatment of the disabled in United States history. But we need not address the arguments on the merits because the parties did not present them to the district court and they have not raised them to us.

**Affirmed; motion denied.**