*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-0375**

In the Matter of the Welfare of the Children of: C. M., Parent.

**Filed August 17, 2015**
**Affirmed**
**Schellhas, Judge**

Ramsey County District Court
File No. 62-JV-14-1497

Nicole S. Gronneberg, St. Paul, Minnesota (for appellant C.M.)

John J. Choi, Ramsey County Attorney, Stephen P. McLaughlin, Assistant County Attorney, St. Paul, Minnesota (for respondent Ramsey County Human Services Department)

John Jerabek, Tuft, Lach & Jerabek, Maplewood, Minnesota (for guardian ad litem)

Considered and decided by Hudson, Presiding Judge; Cleary, Chief Judge; and Schellhas, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SCHELLHAS**, Judge

Appellant asks us to reverse the termination of her parental rights to four children, assigning error to the juvenile court's determinations that (1) the county made reasonable efforts to reunify appellant with the children, (2) statutory grounds existed to terminate appellant's parental rights, and (3) termination of appellant's parental rights was in the children's best interests. We affirm.

## FACTS

Appellant C.M. gave birth to M.C.M.-W. on August 18, 2005; M.Y.M. on March 28, 2007; and M.C.M. on April 20, 2008. M.W., who lived with C.M. for two years during their six-year relationship, is the adjudicated father of M.C.M.-W., M.Y.M., and M.C.M. M.W. physically, emotionally, and sexually abused C.M.; some of the abuse took place in the presence of M.C.M.-W., M.Y.M., and M.C.M. M.W. also abused M.C.M.-W., M.Y.M., and M.C.M., mostly verbally. In late October 2010 during a dispute with C.M., M.W. held a knife to the throat of then five-year-old M.C.M.-W. In December 2010, C.M. obtained an order for protection (OFP) against M.W. on behalf of herself and M.C.M.-W., M.Y.M., and M.C.M.[1]

In 2010, C.M. became involved with M.C., who lived with C.M. for a year during their three-year relationship. M.C. verbally abused C.M. and M.C.M.-W., M.Y.M., and M.C.M. One time he pushed C.M., and he pinched M.C.M.-W., M.Y.M., and M.C.M. every time they misbehaved. In February 2012, Brian Magruder, a child-protection worker at respondent Ramsey County Community Human Services Department (RCCHSD), telephoned C.M. to inform her that M.C. had a history of sexually abusing children and that RCCHSD could consider as neglect any failure by C.M. to take proper precautions to protect her children from M.C. Following this call, C.M. continued to allow M.C. to live in her home, and she became pregnant.

---

[1] In April 2013, C.M. moved to dismiss the OFP against M.W., but the district court struck the motion when neither C.M. nor M.W. appeared for a hearing on the motion.

On February 1, 2013, then four-year-old M.C.M. told a mandated reporter that M.C. had sexually abused her and then five-year-old M.Y.M., and RCCHSD removed M.C.M.-W., M.Y.M., and M.C.M. from C.M.'s care that day. On February 6, RCCHSD petitioned the juvenile court to adjudicate M.C.M.-W., M.Y.M., and M.C.M. as children in need of protection or services (CHIPS) and for the children's out-of-home placement. On February 7, C.M. obtained an OFP against M.C. on behalf of herself and M.C.M.-W., M.Y.M., and M.C.M. On February 11, she gave birth to M.C.'s presumed biological child, M.J.M., who RCCHSD immediately removed from C.M.'s care; RCCHSD amended the CHIPS petition to include M.J.M., and the juvenile court ordered M.J.M. into out-of-home placement.[2, 3]

On February 19, 2013, C.M. admitted the allegations in the CHIPS petition, and the juvenile court adjudicated the children CHIPS and transferred temporary legal custody of the children to RCCHSD. Initially, RCCHSD placed the children in a shelter and then placed them with their great-grandmother. But after RCCHSD learned about problems with that placement, apparently related to the presence of sex offenders in the great-grandmother's home, it returned the children to a shelter. Following the second shelter placement, M.C.M.-W. was hospitalized briefly; RCCHSD then placed M.C.M.-

---

[2] M.C.M.-W., M.Y.M., M.C.M., and M.J.M. hereinafter are referred to collectively as "the children."

[3] In April 2014, M.C. agreed to a voluntary termination of his parental rights to M.J.M.; in September 2014, M.W. agreed to a voluntary termination of his parental rights to M.C.M.-W., M.Y.M., and M.C.M.

W. in a non-relative foster home and placed M.Y.M., M.C.M., and M.J.M. together in a separate non-relative foster home.

In June 2014, RCCHSD petitioned for the termination of C.M.'s parental rights (TPR) to the children. The juvenile court conducted a seven-day TPR trial. At trial, C.M. stipulated that M.C. had sexually abused M.C.M.-W., M.Y.M., and M.C.M., and C.M. admitted that, despite the OFP against M.W., she had had "a lot" of contact with M.W., beginning in March 2013. The juvenile court terminated C.M.'s parental rights.

This appeal follows.[4]

# DECISION

"[A]n involuntary termination of parental rights is proper only when at least one statutory ground for termination is supported by clear and convincing evidence and the termination is in the child's best interest." *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 137 (Minn. 2014) (emphasis omitted). "Language throughout the juvenile protection laws emphasizes that the court 'may,' but is not required to, terminate a parent's rights when one of the nine statutory criteria is met." *Id.* at 136−37. "[T]ermination of parental rights is always discretionary with the juvenile court." *Id.* at 136. Although "[appellate courts] closely inquire into the sufficiency of the evidence" to support the termination of parental rights, *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008), "[c]onsiderable deference is due to the district court's [TPR] decision because a district court is in a superior position to assess the credibility of witnesses," *In re Welfare of Children of B.M.*, 845 N.W.2d 558, 563 (Minn. App. 2014) (quotation omitted).

---

[4] Neither M.W. nor M.C is a party to this appeal.

4

*Reasonable reunification efforts*

"[T]he government has a compelling interest in its role as parens patriae in promoting relationships among those in recognized family units in order to protect the general welfare of children." *R.D.L.*, 853 N.W.2d at 134. Before terminating a parent's rights to her child, the juvenile court must determine "that reasonable efforts to finalize the permanency plan to reunify the child and the parent were made" and must make "individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family." Minn. Stat. § 260C.301, subd. 8 (2014). "'Reasonable efforts' at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance. The quality and quantity of efforts to rehabilitate and reunify the family impact the reasonableness of those efforts." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007) (quotation and citation omitted), *review denied* (Minn. Mar. 28, 2007).

> When determining whether reasonable efforts have been made, the court shall consider whether services to the child and family were:
>
> (1) relevant to the safety and protection of the child;
> (2) adequate to meet the needs of the child and family;
> (3) culturally appropriate;
> (4) available and accessible;
> (5) consistent and timely; and
> (6) realistic under the circumstances.

Minn. Stat. § 260.012(h) (2014). This court reviews a juvenile court's reasonable-efforts determination for an abuse of discretion. *Cf. In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 900–01 (Minn. App. 2011) (noting that "[t]he concept that findings of basic

or underlying fact are reviewed for clear error while 'ultimate facts' and 'mixed questions of law and fact' . . . are reviewed for an abuse of discretion is . . . inherent in juvenile-protection caselaw"), *review denied* (Minn. Jan. 6, 2012).

In this case, the juvenile court found that clear and convincing evidence proved that RCCHSD made reasonable efforts to reunify C.M. and the children. This finding of ultimate fact is based on several underlying findings of fact, including that:

> 83. [C.M.] received a parenting assessment by Dr. Freda Rosen and between 150–200 hours of time from parenting skills worker Julia Stanley over a twelve month period . . . .
>
> . . . .
>
> 85. [C.M.] received bus cards to assist her in attending appointments with school, therapists, and other mental health professionals as well as phone cards.
>
> 86. [C.M.] was referred to Domestic Abuse Project for services . . . .
>
> 87. [C.M.] was also driven to some appointments and visitations by RCCHSD . . . .
>
> . . . .
>
> 89. [C.M.] . . . had an existing relationship with a therapist, Annemarie Herrlich, and RCCHSD did not require [C.M.] to see a different therapist and, instead, encouraged that continuing relationship.
>
> . . . .
>
> 91. . . . RCCHSD provided a myriad of mental health services, social programming, and transportation for [the] children . . . .

The juvenile court also found that

> [C.M.] received a psychological evaluation at African American Family Services (AAFS); individual therapy with Dr. Hill at AAFS . . . ; parenting assessment at AAFS; in-home parenting services with Sean Lewin of AAFS; . . . urinalysis through RS Eden; . . . anger group; relationship skills group; . . . [and] primary and secondary RCCHSD social workers to address [the] children's needs . . . .

The voluminous record contains testimonial and documentary support for the juvenile court's findings of fact. Indeed, C.M. does not claim that these findings are not based on sufficient evidence or are otherwise clearly erroneous. Rather, C.M. argues that the services that RCCHSD provided to her were not reasonable because the record lacks any evidence to prove that RCCHSD attempted to arrange for "trauma specific treatment" to be provided to her. C.M. notes that after Dr. Hill completed C.M.'s psychological evaluation, Dr. Hill determined that C.M. suffered from posttraumatic stress disorder (PTSD) and recommended "trauma focused therapy," such as eye-movement desensitization and reprocessing (EMDR), to address C.M.'s PTSD.[5]

But the juvenile court found that the treatment provided to C.M. by her therapist, Herrlich, was reasonable and sufficient to address C.M.'s mental-health needs. This finding is supported by C.M.'s testimony that she initially sought treatment from Herrlich

---

[5] The juvenile court found that "[t]he recommendation of EMDR treatment was based upon an invalid psychological evaluation." Yet the court also found that the psychological evaluation, like other services provided to C.M., "w[as] relevant to the safety and protection of the children, adequate to meet the needs of the children and family, culturally appropriate, available and accessible, consistent and timely, and realistic under the circumstances." For purposes of this appeal, we assume the validity of the psychological evaluation because the juvenile court considered the evaluation as part of RCCHSD's reunification efforts and C.M. relies upon the evaluation to support her arguments.

7

"[b]ecause of the PTSD" to address the "[t]rauma of abuse" and that her therapy goals with Herrlich were "to improve [her] depression and work with [her] PTSD." C.M. also acknowledged that her sessions with Herrlich were "centered" or "focused" on her needs.

Moreover, "the nature of the services which constitute 'reasonable efforts' depends on the problem presented." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 664 (Minn. 2008) (quotation omitted). Here, the presenting problem was not limited to C.M.'s abuse-related trauma; rather, as recognized by the juvenile court, resolution of C.M.'s mental-health issues was undermined by her failure to take advantage of proffered services through Domestic Abuse Project, her "failure to regularly attend her existing therapy appointments" with Herrlich, "and her decision to continue an abusive relationship" with M.W. during the pendency of the child-protection matter. Dr. Hill testified:

> [One] cannot treat the trauma effectively or safely without a stable state in life. And so if a person is experiencing current violence or abuse, it is not indicated for doing EMDR treatment in particular or doing any type of reexperiencing memory work. So one would work on stabilizing. . . . If there is continued violence, I think it's unlikely stabilizing will be achieved.

Dr. Hill also noted in the psychological evaluation report that C.M. may have a "poor prognosis" as to her PTSD and depression even with treatment and that treatment "is likely a long term and difficult path." EMDR and similar therapies therefore were neither "adequate to meet [C.M.'s] needs" nor "realistic under the circumstances." *See* Minn. Stat. § 260.012(h).

8

Despite C.M.'s assertions to the contrary, her case is distinguishable from *T.R.*, in which the supreme court determined that the county did not make reasonable efforts to reunify the father with his child. *See* 750 N.W.2d at 666. In *T.R.*, the county required the chemically dependent father to demonstrate sobriety but did not offer him treatment options to achieve and maintain sobriety. *See id.* at 659, 664–65. Here, in contrast, RCCHSD provided C.M. with a multitude of treatment options—some of which she rejected outright, and others of which she failed to utilize fully. As aptly stated by the juvenile court, "RCCHSD is not responsible for [C.M.]'s own decision to secretly reengage with the abusive father of her three oldest children, and how this decision undermined her progress in therapy and toward reunification." The court's reasonable-efforts determination does not reflect an abuse of discretion.

### *Statutory grounds for TPR*

Nine statutory grounds exist for involuntarily terminating a parent's rights as to her child, including:

> (2) that the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, . . . and . . . reasonable efforts by the social services agency have failed to correct the conditions that formed the basis of the petition . . . ;
> . . . .
> (4) that a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child. . . . ;

> (5) that following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement. . . . [; or]
>
> . . . .
>
> (8) that the child is neglected and in foster care . . . .

Minn. Stat. § 260C.301, subd. 1 (2014).

> [O]n appeal from a district court's decision to terminate parental rights, [this court] will review the district court's findings of the underlying or basic facts for clear error, but [this court] review[s] its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion.

*J.R.B.*, 805 N.W.2d at 901.

In this case, the TPR petition alleged, and the juvenile court found, the existence of the four above-quoted statutory grounds for termination of C.M.'s parental rights. C.M. argues that RCCHSD's failure to make reasonable efforts to reunify her and the children renders each of the four findings defective. But as discussed above, the court did not abuse its discretion in determining that RCCHSD made reasonable reunification efforts. Therefore, to the extent that C.M.'s arguments rely on insufficient reasonable efforts, her arguments fail.

C.M. also appears to argue that, even if RCCHSD made reasonable reunification efforts, the juvenile court abused its discretion in determining that "[she] has substantially, continuously, and repeatedly refused or neglected to comply with the duties imposed upon [her] by the parent and child relationship." In support of this argument, C.M. points to

10

ample evidence presented at trial that [she] went to great lengths throughout the child protection case to make nearly every visit with her children, took responsibility for not protecting her children from their abuser, M.C., and engaged in extensive testing and other services recommended by [RCCHSD], in an attempt to reunify with her children.

But "[t]hat the record might support findings other than those made by the trial court does not show that the court's findings are defective." *See Vangsness v. Vangsness*, 607 N.W.2d 468, 474 (Minn. App. 2000). And other evidence clearly supports the court's underlying finding, which C.M. does not challenge, that "[C.M.] has not demonstrated an ability to keep [the] children safe or adequately manage the behavioral and mental health services that are in the children's best interest."

Furthermore, "[o]nly one [statutory] ground must be proven for termination to be ordered." *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005). Without casting doubt on the soundness of the juvenile court's finding of a ground for termination under section 260C.301, subdivision 1(b)(2) (failure in duties imposed by parent-and-child relationship), we note that the court's findings under subdivisions 1(b)(4) (palpably unfit to be party to parent-and-child relationship), 1(b)(5) (failure of reasonable efforts to correct conditions), and 1(b)(8) (neglected child in foster care) provide independent grounds to affirm the TPR.

***Best interests of the children***

"[T]he best interests of the child must be the paramount consideration" in any TPR proceeding. Minn. Stat. § 260C.301, subd. 7 (2014). "Th[e best-interests] analysis consists of weighing three primary factors: the child's interest in maintaining the parent-

child relationship, the parents' interest in maintaining the parent-child relationship, and any competing interest of the child. Competing interests include a stable environment, health considerations, and the child's preferences." *In re Welfare of Children of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013) (citation omitted). "[This court] review[s] a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *J.R.B.*, 805 N.W.2d at 905.

In this case, the juvenile court recognized its duty to weigh the three factors, considered each of the children individually, acknowledged the children's interest in maintaining a relationship with C.M. and C.M.'s interest in maintaining a relationship with the children, and discussed the children's needs and C.M.'s demonstrated inability to meet those needs. The court also performed its delicate balancing task and determined that termination of C.M.'s parental rights was in the children's best interests. The court's best-interests determination was aligned with that of the children's guardian ad litem and primary child-protection worker. Based on the previously discussed evidence, we conclude that the court did not abuse its discretion in finding that the children's best-interests were served by terminating C.M.'s parental rights. *See In re Welfare of Child of J.L.L.*, 801 N.W.2d 405, 414 (Minn. App. 2011) ("Determination of a child's best interests is generally not susceptible to an appellate court's global review of a record, and an appellate court's combing through the record to determine best interests is inappropriate because it involves credibility determinations." (quotations omitted)), *review denied* (Minn. July 28, 2011).

**Affirmed.**